ESTATE OF JERRY THOMAS (DECEASED), IMOGENE THOMAS, ADMINISTRATRIX, AND IMOGENE THOMAS, ET AL.,[1] PETITIONERS *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17715–81, 16415–82, 512–83,     Filed March 14, 1985.
1466–83, 1472–83, 1475–83,
1496–83, 1497–83, 1498–83,
1499–83, 1500–83, 1502–83,
5073–83, 9698–83.

*Scott F. Cristman, William D. Eggers, Patrick D. Martin,* and *Paul Pineo,* for the petitioners.
*Edward D. Fickess,* for the respondent.

WHITAKER, *Judge*: This case was submitted fully stipulated pursuant to Rule 122;[2] the stipulation of facts and exhibits attached thereto are incorporated herein by this reference. However, many of the facts set forth herein are based upon our examination of the exhibits and were not set out in the stipulation.

---

[1]Cases of the following petitioners are consolidated herewith: Raymond Leven and Nettie Leven, docket No. 16415–82; Robert P. and Janice K. Kuhn, docket No. 512–83; Henry F. and Margaret K. Goller, docket No. 1466–83; Robert C. and Jeanne T. Baesel, docket No. 1472–83; Warren J. and Alice M. Welling, docket No. 1475–83; George E. and Irene L. Schultz, docket No. 1496–83; Roy B. and Dorothy P. Culler, docket No. 1497–83; Neil C. and Marilyn M. Schauf, docket No. 1498–83; James W. and Annie J. Powell, docket No. 1499–83; Elbert W. and Elizabeth C. Phillips, docket No. 1500–83; William L. and Mary S. Albritton, docket No. 1502–83; Edward Waters and Jane C. Waters, docket No. 5073–83; and Bayard C. Tullar and Teresa Tullar, docket No. 9698–83.

[2]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure and all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

Respondent determined the following Federal income tax deficiencies:

| Docket No. | Petitioner | Year(s) | Deficiency |
|---|---|---|---|
| 17715–81 | Estate of Jerry Thomas (deceased) | 1976 | $20,449.99 |
| | Imogene Thomas, administratrix, | 1977 | 35,831.08 |
| | and Imogene Thomas | 1978 | 23,117.88 |
| | (The years 1978 and 1979 do not | 1979 | 8,761.27 |
| | involve the issues here tried.) | | |
| 16415–82 | Raymond and Nettie Leven | 1976 | 37,874.77 |
| | | 1977 | 25,995.20 |
| 512–83 | Robert P. and Janice K. Kuhn | 1976 | 4,570.62 |
| 1466–83 | Henry F. and Margaret K. Goller | 1976 | 9,141.00 |
| | | 1977 | 4,925.00 |
| | | 1978 | 2,325.00 |
| 1472–83 | Robert C. and Jeanne T. Baesel | 1976 | 4,570.62 |
| 1475–83 | Warren J. and Alice M. Welling | 1976 | 2,072.90 |
| 1496–83 | George E. and Irene L. Schultz | 1976 | 4,570.80 |
| 1497–83 | Roy B. and Dorothy P. Culler | 1976 | 19,042.33 |
| | | 1977 | 10,913.36 |
| | | 1978 | 4,504.82 |
| 1498–83 | Neil C. and Marilyn M. Schauf | 1976 | 28,509.00 |
| 1499–83 | James W. and Annie J. Powell | 1976 | 19,862.73 |
| | | 1977 | 10,123.14 |
| | | 1978 | 5,611.00 |
| 1500–83 | Elbert W. and Elizabeth C. Phillips | 1976 | 9,142.00 |
| | | 1977 | 5,549.00 |
| | | 1978 | 2,374.00 |
| 1502–83 | William L. and Mary S. Albritton | 1976 | 41,978.00 |
| | | 1977 | 26,505.00 |
| | | 1978 | 11,678.00 |
| 5073–83 | Edward and Jane C. Waters | 1976 | 428.00 |
| 9698–83 | Bayard C. and Teresa Tullar | 1976 | 19,792.00 |
| | | 1977 | 10,417.00 |
| | | 1978 | 4,029.00 |

The petitioners in this consolidated proceeding are among the 32 limited partners in a partnership known as 1975 Equipment Investors (Partnership), a limited partnership formed to acquire equipment for lease and/or sale. The pretrial order, dated May 26, 1983, severed for trial, in this proceeding solely

all tax issues arising out of the investment by petitioners in the Partnership. By stipulation, the parties submitted for our consideration only the following: (1) Whether the Partnership is the owner of various items of computer equipment for Federal income tax purposes; and (2) whether amounts paid by the Partnership to E.F. Hutton & Co., Inc. (E.F. Hutton), as an equity placement fee may be amortized over the life of the Partnership.

## FINDINGS OF FACT

In Appendix A at the end of this opinion, we set forth the residences of the various petitioners in this proceeding when their petitions were filed and the number of Partnership units owned by them at all material times. Petitioners all were partners in the Partnership, which was formed by the well-known investment firm E.F. Hutton, a subsidiary of the E.F. Hutton Group, Inc. Prior to the activities at issue herein, E.F. Hutton had organized three other limited partnerships which had purchased IBM Systems 370 and 360 computer equipment for lease to a number of corporate lessees and had organized one limited partnership which had purchased a McDonnell Douglas DC-9 aircraft for lease to a commercial airline. E.F. Hutton also had participated as a broker in bringing together prospective lessors and lessees of computer equipment.

### Creation of the Partnership

On January 15, 1975, E.F. Hutton formed 1975 Equipment Manager, Inc. (Equipment Manager or the general partner), a Delaware corporation, the sole function of which was to act as general partner of the Partnership. During all material times, Equipment Manager was a wholly owned subsidiary of E.F. Hutton.

The Partnership, a New York limited partnership, also was formed on January 15, 1975, pursuant to article 8 of the New York Partnership Law. As set forth in the amended and restated articles of limited partnership (Partnership agreement), the Partnership was to acquire computer central processing units and related equipment (collectively referred to as equipment), to lease or sell the equipment to others and

to perform any acts to accomplish those purposes.[3] The Partnership agreement provided for a general partner, one class B limited partner,[4] and for the issuance of up to 52 class A limited partnership units. The general partner was to receive a commencement fee of $25,000 in consideration for its services, in addition to a management fee of 2.1 percent of Partnership gross income.[5] The overhead of the general partner was not considered to be an expense of the Partnership. Under the terms of the Partnership agreement, all items of income or loss were to be allocated, and all distributions of cash made, in accordance with each partner's pro rata share. All net cash-flow of the Partnership was to be distributed, first to the general partner to the extent of outstanding advances (plus interest), and thereafter to all partners in accordance with their pro rata shares at the time of distribution. The Partnership life was to commence on the day on which its certificate was filed and to end no later than December 31, 1983.

## Offering and Sale of Partnership Interests

In July and August 1975, the Partnership prepared a private placement memorandum (memorandum) to be used for offering limited Partnership interests to selected E.F. Hutton customers. As described in the memorandum, the instant transaction was to be structured as follows: Upon receipt of sufficient capital from prospective investors, the Partnership was to purchase IBM System 370 computers for approximately $9 million by borrowing a substantial portion of the cost of each computer, and immediately thereafter it was to lease the

---

[3]The objectives of the Partnership were stipulated to be as follows:

"To borrow a substantial portion of the cost of each IBM System 370 computer; to lease the computers to financially sound lessees for a period of time sufficient to fully repay the borrowings; to realize cash flow during the terms of the initial Leases which was at least sufficient to cover partnership expenses; to permit modest cash distributions to the limited partners beginning in 1976; and to realize the largest possible gain upon either the re-leasing or sale of the computer systems at the expiration of the initial lease terms."

[4]Mr. Donald Sarin, who at all material times was the class B limited partner, was a vice president of E.F. Hutton at the inception of the Partnership. As E.F. Hutton's national coordinator of equipment leasing, Mr. Sarin was responsible for reviewing the investment quality of the instant transaction, marketing the private placement, and supervising the administration of the instant leases. The class B limited partner contributed $500 in cash and received a 0.1-percent interest in the Partnership.

[5]The general partner contributed no cash but received a 1-percent interest in the Partnership.

computers to financially sound lessees for a period of time sufficient to repay fully the borrowings. In order to borrow funds at commercially reasonable interest rates, the Partnership was to pledge both the equipment and the leases as security to the lenders. The memorandum indicated that the Partnership tentatively had arranged to purchase three IBM System 370 computers and lease them to three separate lessees: Sterling Drug Co. (Sterling), Borg-Warner Corp. (Borg-Warner), and Exxon Corp. (Exxon). All of these purchases and leases were arranged through the efforts of equipment brokers, who specialized in IBM computer equipment. The parties have stipulated that, at the time the memorandum was prepared, the Partnership anticipated purchasing and leasing a fourth IBM 370 System, depending on the degree of success of the offering, and the memorandum so indicated. According to the memorandum, during the terms of the initial leases, the Partnership was expected to realize sufficient cash-flow to cover Partnership expenses and to permit modest cash distributions to the limited partners beginning in 1976. It further indicated that, upon expiration of the initial lease terms, the Partnership planned either to re-lease or sell the computers on a basis which would result in the largest possible gain to the Partnership.

Concerning the economic feasibility of investing in the Partnership, each investor was advised in the memorandum to consult his own counsel as to the legal and economic risks and benefits of the investment. It indicated that the investment objectives of the Partnership were:

> To provide an investment opportunity, including
> (a) Maximum use of tax benefits applicable to the Partnership's business, and
> (b) Modest cash distributions to the Limited Partners beginning in 1976, and
> (c) Realization of net cash proceeds upon sale or re-leasing of the computer equipment at the end of the initial leases.

On its face, the memorandum made it clear that investment in the Partnership was only for certain types of investors—those who were able to commit capital for a long-term investment of limited liquidity, who were able to bear the risk of losing their investment, and who were in a position to benefit from the expected tax benefits of the Partnership. Numerous references

are made in the memorandum to taxpayers in the 50-, 60-, and 70-percent brackets, and to the general tax consequences to them of investment in the Partnership. With regard to tax benefits, however, the memorandum cautioned:

Although the tax benefits anticipated from the Partnership could be said to have the effect of providing a return on investment in the earlier years, tax obligations will arise in later years; the ultimate success of the Partnership will therefor depend upon the profitability of its business and the residual value of the equipment in the later years.

In attempting to provide prospective investors with an assessment of the importance of residual value potential, the memorandum explained that, "on termination of the leases at the end of a projected term of 8 years, unless the computers have a residual value of approximately 14% of the Partnership's original purchase price, the Partnership will suffer an economic loss on the computers." The memorandum declined to predict the expected residual value of the computers, cautiously describing the computer leasing industry as very competitive and emphasizing that price changes and technological obsolescence could have a materially adverse effect upon the Partnership's ability to re-lease or sell the equipment at the end of the lease terms. By the same token, it indicated that risks were minimized, because the models were purchased early in their life cycles.

The following schedule copied from the memorandum contains a calculation of the expected cash-flow to the Partnership based upon the projection of total rental income extrapolated from the three tentatively negotiated leases and the expected expenses:

SCHEDULE II

\*       \*       \*       \*       \*       \*       \*

(in thousands)

| Taxable year | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|---|---|---|
| *Rental income* | $262 | $1,527 | $1,527 | $1,527 | $1,527 | $1,527 | $1,527 | $1,497 | $1,123 |

*Disbursements*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Debt service | $62 | $1,442 | $1,442 | $1,442 | $1,442 | $1,442 | $1,442 | $1,413 | $1,056 |
| Fees and expenses | 12 | 76 | 76 | 76 | 76 | 76 | 76 | 75 | 60 |
| Applied to equity | 188 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total disbursements | 262 | 1,518 | 1,518 | 1,518 | 1,518 | 1,518 | 1,518 | 1,488 | 1,116 |
| Cash-flow | 0 | 9 | 9 | 9 | 9 | 9 | 9 | 9 | 7 |

Contrary to the projections, the actual cash distributions were zero for all years except 1976, when a cash-flow of $8,897.88 was achieved and $220 per unit distributed.

The net economic effects of an investment in one Partnership unit (assuming that 40 units would be sold and the anticipated leases ran their full terms), without considering the residual value of the equipment at the end of the leases but taking into account tax benefits, were estimated in the memorandum for taxpayers in the 50-, 60-, and 70-percent tax brackets as follows:

SCHEDULE III

| Year | Share of partnership profit (or loss) | Share of partnership cash-flow | Net tax savings at 50% plus cash-flow | Net tax savings at 60% plus cash-flow | Net tax savings at 70% plus cash-flow |
|---|---|---|---|---|---|
| 1975 | ($28,140) | 0 | $14,070 | $16,884 | $19,698 |
| 1976 | (36,490) | $220 | 18,465 | 22,114 | 25,763 |
| 1977 | (19,360) | 220 | 9,900 | 11,836 | 13,772 |
| 1978 | (6,480) | 220 | 3,460 | 4,108 | 4,756 |
| 1979 | 3,440 | 220 | (1,500) | (1,844) | (2,188) |
| 1980 | 5,710 | 220 | (2,635) | (3,206) | (3,777) |
| 1981 | 9,470 | 220 | (4,515) | (5,462) | (6,409) |
| 1982 | 29,870 | 220 | (14,715) | (17,702) | (20,689) |
| 1983 | 23,960 | 170 | (11,810) | (14,206) | (16,602) |
| Totals | (18,020) | 1,710 | 10,720 | 12,522 | 14,324 |

The memorandum then proceeded to quantify the results of the purchase of one $30,000 investment unit, based upon realization of various potential residual values of the equipment which, when added to the net tax benefits and cash-flow indicated above, resulted in the following proceeds:

## SCHEDULE IV[6]

### If Residual Value Is 20% of Original Cost

|  | EFFECTIVE TAX RATE | | |
|---|---|---|---|
|  | *50%* | *60%* | *70%* |
| Resulting from operations [From Schedule III] | $10,720 | $12,522 | $14,324 |
| Cash from sale | 39,558 | 39,558 | 39,558 |
| Tax on income from sale | 14,278 | 17,133 | 19,989 |
| Proceeds of investment | 36,000 | 34,947 | 33,893 |

### If Residual Value of [sic] 15% of Original Cost

|  | EFFECTIVE TAX RATE | | |
|---|---|---|---|
|  | *50%* | *60%* | *70%* |
| Resulting from operations [From Schedule III] | $10,720 | $12,522 | $14,324 |
| Cash from sale | 29,769 | 29,769 | 29,769 |
| Tax on income from sale | 9,383 | 11,260 | 13,136 |
| Proceeds of investment | 31,106 | 31,031 | 30,957 |

### If Residual Value Is 10% of Original Cost

|  | EFFECTIVE TAX RATE | | |
|---|---|---|---|
|  | *50%* | *60%* | *70%* |
| Resulting from operations [From Schedule III] | $10,720 | $12,522 | $14,324 |
| Cash from sale | 19,979 | 19,979 | 19,979 |
| Tax on income from sale | 4,488 | 5,386 | 6,284 |
| Proceeds of investment | 26,211 | 27,115 | 28,019 |

In presenting these residual value figures, however, the memorandum again cautioned:

There is not sufficient experience to accurately estimate the residual value of System/370 equipment. Technological obsolescence and the effects

---

[6]Despite the fact that the memorandum contemplated the purchase of computer equipment having a total original cost of approximately $9 million (which closely approximates the actual original cost), if all 40 units were sold, the original cost figures used in describing residual value in these tables were closer to $8 million, by our calculation. We know of no reason for the use of these lower figures other than the conservative approach of an offering memorandum.

The stipulated testimony of Warren Wallace, an executive of the general partner, indicates that the residual value percentages of 10, 15, and 20 percent were chosen for illustrative purposes only and not as actual anticipated values.

of inflation are two major variables which make residual evaluation difficult. * * *

The Partnership retained E.F. Hutton to act as its agent in soliciting offers to subscribe to 40[7] class A limited partnership units at \$30,000 per unit. Other than the memorandum, E.F. Hutton furnished no sales literature or other written information to prospective limited partners. Through its national brokerage network, E.F. Hutton, acting as the Partnership's exclusive sales agent, successfully raised the full amount of capital (\$1,200,500) by selling 40 class A limited partner units to 32 investors. Each type of partner's contribution to, and pro rata share of, the Partnership was as follows:

|  | Capital | Pro rata share |
|---|---|---|
| General partner | (none) | 1    percent |
| Class B limited partner | \$500 | 0.1 percent |
| Class A limited partner | 1,200,000 | [8]98.9 percent |
| Total | 1,200,500 | 100.0 |

This \$1,200,500 in cash was disbursed in 1975 as follows:

| Paid to IBM for the equipment | \$945,673 |
|---|---|
| Paid to equipment brokers | 221,154 |
| Paid to E.F. Hutton as equity placement fee | 102,000 |
| Paid as formation expenses | 20,000 |
| Paid as commencement fee | 25,000 |
| Total | [9]1,313,827 |

The "equity placement fee" referred to above was paid by the Partnership in September 1975. This fee was a sales commission of 8½ percent of the capital raised, which represents a fair and reasonable fee for an offering of this type.

After the offering was completed, the Partnership, through a broker, identified a fourth leasing opportunity with Nissan Motor Corp. (Nissan), and a lease between Nissan and the Partnership was negotiated in November 1975. The projected

[7]According to the memorandum, the general partner believed it best to refrain from selling the additional 12 units authorized in the Partnership agreement unless it was necessary to finance the purchase of the equipment.

[8]The owner of each class A partner unit owned a 2.4725-percent pro rata share of the Partnership.

[9]The parties have stipulated that in 1975 it was anticipated that the 1975–76 net cash-flow would be used to pay some of these startup and acquisition expenses, although the record does not indicate whether the disbursements in excess of the cash received were in fact paid by means of short-term loans or in some other fashion.

cash-flow on the basis of the four leases is contained in Appendix B at the end of this opinion. The predicted income and expenses of the Partnership during the terms of the four leases (excluding residual value) did not vary significantly from those which had been predicted in the memorandum,[10] and neither prediction anticipated a substantial positive net cash-flow during the lease terms.

The directors and executive officers of the general partner from its formation through 1978 were all executives of E.F. Hutton and were compensated by E.F. Hutton. E.F. Hutton established a separate office and staff[11] in Rochester, New York, to perform the duties of the general partner, including negotiation and administration of the leases with Sterling, Borg-Warner, Exxon, and Nissan. The staff also maintained records reflecting the monthly payment of rent by the various lessees, and the application of these payments to debt service and to the payment of Partnership expenses. These records were reviewed quarterly in connection with the preparation of unaudited quarterly financial statements which were supplied to all limited partners. Audited financial statements were prepared annually and certified by the public accounting firm of Arthur Andersen & Co. The Partnership reported its ownership of the computer equipment to various State and local authorities. The performance of the lessees under the various leases was monitored to assure that the equipment had been properly identified by tags or other means disclosing the Partnership as owner, and that the lessees' required insurance coverage showing the Partnership as an insured was maintained or self-insurance was properly elected.

### Leasing and Financing Arrangements

The four lessees each placed orders directly with IBM for the systems they desired and then transferred these orders to the respective brokers or to the Partnership. The Partnership had no role in selecting the equipment packages ordered by the lessees, nor in advising the lessees as to which equipment

---

[10]See pp. 417–418 supra.

[11]The evidence does not show whether the staff was actually employed and compensated by E.F. Hutton or the general partner, or both. However, it is likely that the general partner was in fact an alter ego of E.F. Hutton and that the separate entity was merely used for bookkeeping purposes.

would be appropriate for their needs. Upon delivery, title was conveyed in three cases from IBM to the brokers and by the brokers to the Partnership; in the fourth case (Nissan), IBM conveyed title directly to the Partnership. The Partnership acquired legal title to each of the systems before the equipment was placed in service by the lessees. The Partnership paid the following amounts to brokers in connection with the lease arrangements:

| | |
|---|---|
| Alanthus Corp.[12] ........................................ | $92,174.60 |
| (Exxon lease) | |
| Lease Financing Corp.[13] ............................... | 35,900.00 |
| (Sterling lease) | |
| Lease Financing Corp.[13] ............................... | 36,955.00 |
| (Borg-Warner lease) | |
| Unicom Computer Corp.[14] ............................ | 56,125.00 |
| (Nissan lease) | |
| Total ........................................ | 221,154.60 |

All dealings between the Partnership and the brokers were at arm's length, and broker fees were stipulated to be reasonable in amount.

In accordance with customary industry practices, payment to IBM was made by the Partnership within approximately 30 days after it acquired legal title to the equipment. The Partnership paid fair market value for the equipment. The total purchase price paid by the partnership to IBM for the four computer systems was $9,070,234, paid for by $945,673 of Partnership cash and $8,124,561 of nonrecourse debt, which was secured by the equipment and an assignment of the leases. The financing of the various models of computers at issue here was as follows:

---

[12]The Partnership also retained Alanthus Corp. (Alanthus) as managing agent with respect to the Exxon equipment for a monthly fee of $0.0551724 of Exxon rental payments and further retained Alanthus as its exclusive broker for the remarketing of the equipment at the end of the initial lease, with Alanthus' compensation for such services fixed at 4.617 percent of rentals or 5 percent of sales proceeds.

[13]Lease Financing Corp. was not entitled to receive any other payments from the Partnership in connection with either the Sterling or the Borg-Warner equipment, nor did it have any further agreement with the Partnership in connection with this equipment. Nevertheless, it was reasonable to assume that the Partnership would have to pay approximately 5 percent in broker's fees when it tried to sell the equipment.

[14]The Partnership also retained Unicom Computer Corp. (Unicom) as its exclusive broker to assist with the re-lease or sale of the computer equipment upon termination of the Nissan lease. Unicom's fee for these additional services was fixed at 5 percent of the net proceeds. This fee was stipulated to be reasonable in amount.

### *Exxon (Model 370/168)*

| | |
|---|---|
| First Jersey National Bank ............................ | $3,138,000 |
| Wilmington Trust Co. ................................... | 1,000,000 |
| Partnership capital ...................................... | 470,730 |
| Total cost of system .................................... | 4,608,730 |

### *Borg-Warner (Model 370/3145)*

| | |
|---|---|
| Lease Financing Corp.[15] .............................. | $1,145,000 |
| Partnership capital ...................................... | 139,910 |
| Total cost of system .................................... | 1,284,910 |

### *Nissan (Model 370/3158)*

| | |
|---|---|
| Sumitomo Bank of California ......................... | $1,953,261 |
| Partnership capital ...................................... | 223,873 |
| Total cost of system .................................... | 2,177,134 |

### *Sterling (Model 370/3145)*

| | |
|---|---|
| Merchants National Bank of Allentown ........................................... | $888,300 |
| Partnership capital ...................................... | 111,160 |
| Total cost of systems .................................. | 999,460 |

The amount of the monthly rental payments to the Partnership under all leases was consistent with rentals for comparable long-term equipment leases. The parties have stipulated that the amount of these rental payments was negotiated at arm's length, and that for each lease, the rental payments were less than those available under third-party operating leases[16] or under leases made directly with IBM. However, the amount also was negotiated with some reference to the cost of equipment and the cost of money required to purchase such equipment. The monthly lease payments to the Partnership and the amounts due monthly from the Partnership to the lenders were as follows:

---

[15]Fist Trust Co. of St. Paul (First Trust), the original anticipated lender, was unable to make a loan to the Partnership when payment to IBM was due for the Borg-Warner computer equipment. Accordingly, the Partnership borrowed the requisite funds from Lease Financing Corp. (LFC) on an interim basis pursuant to an earlier agreement. By Dec. 12, 1975, First Trust purchased the Partnership's promissory note from LFC.

[16]This term is not defined in the stipulation, but on the basis of the record, we assume that an operating lease is one of substantially shorter duration than the leases here.

| Lessee | Monthly lease payment | Monthly debt payment |
|---|---|---|
| Exxon | $66,826.00 | $61,596.15 |
| Sterling | 14,991.00 | 14,542.69 |
| Borg-Warner | 17,453.06 | 17,167.10 |
| Nissan | 33,908.86 | 32,964.77 |
| Totals | 133,178.92 | 126,270.71 |

Rentals were to be paid directly to the financing bank, and the banks were directed to apply the rentals to repayment of amounts due from the Partnership, to remit to Alanthus its brokerage fees (in the case of Exxon), and in all four cases, to pay the excess to the Partnership. All four leases were "net leases" in a form commonly used in the industry. The lessees were responsible for all fees and taxes incurred in connection with the equipment (excluding income taxes payable by the lessor), and were required to keep the equipment insured at their expense. The lessees also were required to maintain the equipment at their expense and to keep in force an IBM maintenance agreement (or, in the case of Exxon, an equivalent maintenance agreement) with respect to the equipment. Two of the leases expressly state that title to the equipment at all times remained with the lessor, and it is stipulated that the lessees had no rights to interests in the equipment except as lessees under the four leases in the record.

The lessor was not responsible to the lessees for the consequences of defects in, damage to, or loss or destruction of the equipment. In the event of repairable damage to the equipment, the lessees were required to repair it at their own expense. In the event of damage beyond repair, the lessees were required in one case, to replace the equipment, in two of the others, to pay the lessor a casualty loss value (which was specified in schedules to the leases as a percentage of equipment cost, such percentage declining slightly each month), and in the fourth case, to pay the greater of the casualty loss value (which was specified as a lump-sum dollar value that declined each month) or the full replacement cost.

All four of the lessees had options to terminate their leases prior to expiration of the initial lease periods, subject to payment of stated termination payments also set forth in schedules attached to the leases. One of these schedules recited specific lump-sum dollar values, and the others expressed the

termination values as a percentage of original cost. Termination was only permitted after the passage of 5 months in the case of the Exxon lease, 39 months in the cases of the Sterling and Borg-Warner leases, and 52 months in the case of the Nissan lease. Termination payments and casualty payments were, on all dates set forth in the schedules, more than sufficient to pay off all Partnership debts with respect to the computers subject to the leases. In two cases, in the event that a lessee decided to terminate, the lessor and lessee were to use their best efforts to sell (and in one case to sell or re-lease) the equipment subject to the terminated lease, and the lessee was only required to pay the amount, if any, by which the termination value exceeded the highest offer. If no offer was made, the terminating lessee had to pay the full termination penalty,[17] whereupon the lease obligations would cease, and the lessor was free thereafter either to re-lease or sell the equipment. In the two other cases, the lessor was required to sell the equipment for the highest cash offer and refund the proceeds (less the selling expenses) to the terminating lessee.

In three of the leases, the lessees had options to purchase or re-lease the equipment under the leases at the end of the initial lease terms. Such options required the payment of fair market value or fair market rent, as of that date, to the Partnership. No lease contained a provision obligating the lessee to purchase or re-lease the equipment at the end of the respective lease term. In the absence of such renewal or purchase, upon expiration of each lease, the lessees were obligated, at lessees' expense, to deliver the equipment to a location to be specified by the Partnership. The leases were scheduled to terminate on the following dates:

| | |
|---|---|
| Exxon | October 1983 |
| Sterling | Nov. 30, 1982 |
| Borg-Warner | Nov. 1, 1983 |
| Nissan | Dec. 1, 1982 |

As required by the lease terms, the Partnership filed appropriate elections, and the lessees claimed all available tax credits in connection with the equipment.

---

[17] Under its initial lease, Exxon's termination payments were guaranteed by Alanthus, to a degree.

Pursuant to the terms of its lease, Exxon, one of the lessees, had the right to request the lessor to purchase and lease to Exxon any IBM model upgrades or features for its system, provided appropriate terms could be negotiated. By reason of that lease provision, in late 1976 and mid-1977, two sets of upgrade equipment were leased to Exxon.

In August 1978, because of IBM price reductions, Exxon decided to terminate its lease unless rental payments were reduced. In the event of early termination, the Partnership would have received rental income in a substantial lump sum from the termination payments. In the event that such termination resulted in the sale of the equipment, substantial recapture of depreciation would have occurred. In order to avoid these adverse tax consequences, a restructured lease was entered into in September of that year which extended the old lease term until September 15, 1985, and reduced Exxon's monthly rental on both the original equipment and the two upgrades from $73,476 to $60,000. Under the restructure, Alanthus was not entitled to any brokerage fees and assumed the full economic risks of termination payments. In connection with the renegotiation of the Exxon leases, the Partnership restructured its debt by borrowing $3,335,571.91 from a bank and paying off the earlier loans obtained in connection with the equipment leased to Exxon. The monthly payments on the new debt were equivalent to Exxon's new rental payment to the Partnership.

### Residual Value

During this period of time, the obsolescence of computer equipment occurred primarily as a result of technological advances. Thus, for purposes of this case, the rate of obsolescence or diminishing value is directly related to the rate of introduction of new, technically advanced equipment models. During these years, IBM was the primary factor influencing the prices for used IBM computer equipment. IBM announcements about new products or price changes usually had an immediate impact on the market values of used IBM computers.

In the early 1960's, IBM had a major impact on the computer world with the announcement of the IBM 360 family of computers. This product line was a drastic departure from

previous offerings in that it combined into a single family unit what had been previously a conglomeration of several different models. For a long time thereafter, it appeared that IBM's pace of new products and pricing policies were stable and relatively predictable. IBM tended to announce major generations of new computers at intervals of 5 to 6 years.

In 1971, IBM introduced the first models of the System 370, which provided increased internal processing speed and data storage capacity, resulting in a lower cost per unit of work processed as compared to the System 360. The IBM System 370 Model 168, which was leased to Exxon, was announced in 1972 as the successor to an earlier model of the System 370. A high-end virtual storage machine, it provided cost savings and operational advantages over its predecessor and became quite popular with very large advanced users. The IBM Model 3158, leased to Nissan, also was one of the larger members of the 370 series. It was announced in 1972 and was a successor to the System 370 Model 155,[18] becoming available in April 1973. IBM Model 3145 units were leased to Sterling and Borg-Warner. That model was a medium sized, general purpose computer with advanced memory capabilities. This advanced version was announced in February 1973.

During the early 1970's, internal IBM documents had indicated a plan for a "Future System" (FS). It was generally known in the industry that the FS was expected to be another dramatic departure from earlier IBM trends, similar in scope to the differences between the Model 360 and earlier families. However, by May 1975 many in the field believed that IBM was going to cancel the FS program, and this knowledge had a buoying effect on the residual value predictions of many experts at the time.[19] By October 1976, it was clear that IBM had abandoned the FS and that future changes in IBM's product lines would be "evolutionary" rather than "revolu-

[18]The Model 155 was found in *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd., revd., and remanded 752 F.2d 89 (4th Cir. 1985), to be "trailing behind new technology" when acquired in 1975. 81 T.C. at 190.

[19]We note that the expert's report presented by Frederic G. Withington in this proceeding was based upon an earlier report that he had prepared for Arthur D. Little, Inc., in May 1975. In that earlier report he did not base his predictions of residual value upon abandonment of the FS; to the contrary, he appears to have presupposed its introduction. Given the proximity in time, we do not view this testimony as inconsistent with our finding but instead attribute the discrepancy to the fact that the report may have been prepared prior to the dissemination of rumors about IBM's abandonment of the FS program or to Mr. Withington's more conservative approach.

tionary." As it actually turned out, however, IBM in January 1979 announced a completely new line of computers, the IBM Model 4300, which had a profound effect on the computer industry and rendered obsolete prior predictions concerning residual values of used IBM 370 models.[20]

Those E.F. Hutton executives who were concerned with the instant transactions were familiar with computer equipment, and with equipment leasing transactions and residual value projections in connection therewith.[21] From their familiarity with those projections, they expected in 1975 a minimum residual value range for the instant equipment of 15 to 20 percent and believed that expectations of as high as 30 percent were reasonable.[22]

We find these estimates to be thoroughly reliable, reasonable, and confirmed by the evidence in the record as a whole.[23]

---

[20]In addition to being far superior in price and performance, the 4300s were much less expensive to operate than their predecessors. Consequently, the 370 models declined in value at a much faster rate than had been predicted by many forecasters, since the introduction of this new model had been unexpected.

[21]We note that this case thus is in sharp contrast to the situation presented in *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984), where the transactions were handled in a "nonbusinesslike manner" (78 T.C. at 508, 510). See note 22 *infra*.

[22]Warren F. Wallace, one of the E.F. Hutton executives, had prior to the instant transaction been actively involved in the formation of computer leasing partnerships. As an E.F. Hutton executive, he was directly involved in identifying investment opportunities for E.F. Hutton customers. In connection therewith, he had become familiar with projections of residual values of IBM computer equipment by well-informed outside sources. Part of his optimism concerning potential residuals was due to the possibility that IBM's upcoming models would be compatible with the System 370 models. He also recognized that there was a chance that residual value could fall below 15 percent. On the basis of his experience and investigations, he believed that the Partnership's leasing arrangements made good economic sense, apart from tax considerations. Mr. Wallace based this conclusion in the additional facts that short lease terms would be used, the lessees would be financially sound, and that risks would be further minimized by the use of more than one lessee.

[23]A Stanford Research Institute study prepared in February 1975 indicates that between 10 and 11 years from market introduction, the market value of a central processing unit is likely to be approximately 17 to 18 percent of selling price, although the study emphasized that these figures were averages of fluctuating prices. Because responsible representatives of the general partner indicated familiarity with residual value projections in 1975 (see note 22 *supra*), it is likely that this study was known to them when they structured the instant transaction.

Mr. Withington, who testified for respondent in *Rice's Toyota World, Inc. v. Commissioner*, *supra*, predicted in May 1975 that, even with the advent of the FS capabilities looming on the horizon, the instant models, when weighted according to the original list cost of each system over original list total costs, could be expected to have residual values of between 9 and 18 percent of cost. Mr. Withington's prediction is the most conservative one in the record. See note 19 *supra*.

Two other witnesses, Hartmann and Lyons, testified that in August 1975, they expected residual values of the instant models of equipment to be between 20 and 30 percent by 1982 or 1983. Respondent presented no evidence to indicate that such expectations were unrealistic, merely contending on brief that Mr. Hartmann valued a more expensive computer in one instance. Even if we accept this contention, Mr. Hartmann's overall weighted residual value, expressed as a percentage of original list cost, would have exceeded 20 percent.

The parties have stipulated that, as of August 1975, it was reasonable to expect the equipment to have remaining useful lives of at least 3 years at the end of the initial leases, and that it also was reasonable to expect that the aggregate residual value of all equipment owned by the Partnership at the end of the lease terms would be at least 14 percent of the overall expected cost of that equipment. A 14-percent residual value based upon an original cost of approximately $9 million (indicated in the memorandum to be the equipment's total expected cost) would have generated approximately $1,260,000.[24] When this amount is added to the total cash-flow predicted in the memorandum during the terms of the leases of approximately $70,000, a 14-percent residual value would have produced something very close to a breakeven for the Partnership after 5 percent in broker's fees for selling the equipment[25] is taken out.[26] A 20-percent residual value would have produced a pre-tax profit to the Partnership of $580,000.[27]

The fact that some 4 years later the bottom fell out of the used computer market does not alter the reasonable nature of the predictions in August 1975. The higher predictions were made in part in reliance upon continued high anticipated levels of inflation[28] and IBM's historically slow and steady advancement in the field. Rumors that the Future System would be abandoned encouraged many to believe that, since models likely to be introduced by IBM in the future might be compatible with the 370 models, the residual values of those models would be substantial. Moreover, in January 1975, IBM announced an 8-percent increase in the price of new 370 computers. Residual values were generally expressed as a

---

[24]The parties have stipulated that a residual value of 14 percent *or $1,300,000* was reasonably expected, but since 14 percent of $9 million is $1,260,000, we have not been able to discern the derivation of $1,300,000.

[25]See notes 12–14 *supra*.

[26]

| | |
|---|---:|
| $9 million × .14 = | $1,260,000 |
| plus cash-flow expected in memorandum | 70,000 |
| less broker's fee (5% × $1,260,000) | (63,000) |
| less total amount invested | (1,200,000) |
| Total partnership profit | 67,000 |

[27]

| | |
|---|---:|
| $9 million × .20 = | $1,800,000 |
| plus cash-flow expected in memorandum | 70,000 |
| less broker's fee (5% × $1,800,000) | (90,000) |
| less total amount invested | (1,200,000) |
| Total partnership profit | 580,000 |

[28]The Consumer Price Index rose by 11 percent in 1974.

percentage of the current IBM list price at the time of the residual value prediction; therefore, expected increases in list prices understandably would result in even higher expected residual values when expressed as percentages of original costs.[29] Accordingly, in view of the fact that the Partnership was expected to break even if a 14-percent residual value were achieved and that contemporaneous predictions indicated that a 20- to 30-percent residual value was reasonably possible, there was a reasonable expectation of profit accruing to the Partnership by the end of the lease terms. Thus the Partnership entered into the activity with the requisite profit objective.

The Partnership reported its income and expenses on a cash basis. Income consisted primarily of gross rental receipts received under the leases. Expenses included depreciation, management fees, amortization of brokerage fees and deferred costs, State sales tax, interest, and miscellaneous administrative expenses. The equity placement fee paid to E.F. Hutton—which is in issue—was amortized over a 9-year period. On its Federal income tax returns (Forms 1065) for 1975 through 1982, the Partnership reported the following:

| Year | a. Partnership income (loss) | b. Investment interest expense | Total (a – b) |
|---|---|---|---|
| 1975 | ($1,196,028) | - - - | ($1,196,028) |
| 1976 | (769,227) | $709,659 | (1,478,886) |
| 1977 | (187,717) | 670,610 | (858,327) |
| 1978 | 289,241 | 657,678 | (368,437) |
| 1979 | 158,447 | 509,064 | (350,617) |
| 1980 | 543,806 | 405,665 | 138,141 |
| 1981 | 875,538 | 302,965 | 572,573 |
| 1982 | 2,354,890 | 182,071 | 2,172,819 |

The income or loss per class A limited Partnership unit resulting from those amounts was as follows:

| Year | Profit (loss) |
|---|---|
| 1975 | ($29,572) |
| 1976 | (36,565) |
| 1977 | (21,222) |

[29]For example, if the price of a computer on the date of a predicted 20-percent residual value was $100, a residual value of $20 would be expected. However, if that list price were to increase subsequently to $150, the expected 20-percent residual value would be $30, which constitutes 30 percent of the original actual cost.

| Year | Profit (loss) |
|------|---------------|
| 1978 | ($9,110) |
| 1979 | (8,669) |
| 1980 | 3,416 |
| 1981 | 14,157 |
| 1982 | 53,723 |
| 1983 [30](estimated) | 23,960 |
| Total | (9,882) Net loss |

Petitioners reported their shares of these amounts on their returns for some or all of the years 1976, 1977, 1978,[31] and respondent disallowed petitioners' shares of Partnership losses and investment interest expense deductions[32] stating, inter alia, either that it had not been established (1) that a deductible loss had been sustained by the Partnership or (2) that the petitioners or the Partnership was the owner of the subject equipment because they had not incurred the benefits and burdens of ownership and thus the leases were not true leases. If the Partnership is determined to be the true owner of the equipment, respondent asserts that amounts paid for the equity placement fee to E.F. Hutton constitute a capital asset that may not be amortized.

OPINION

### Partnership's Ownership of Equipment

The first question to be addressed is whether the Partnership is correctly viewed as the owner of the equipment for tax purposes. Petitioners take the position that the Partnership is the owner because it bore the benefits and burdens of ownership. While there was expected to be little positive net cashflow to the Partnership during the lease periods, and little risk that lease payments would not fully amortize the debt in connection with the equipment, petitioners contend the Part-

---

[30]The Partnership return for 1983 is not part of the record, since the trial occurred before the end of the calendar year. We have used, therefore, the predicted figure in the memorandum (which is contained in Schedule III, reproduced at p. 418 *supra*).

[31]In the case of petitioners in docket No. 1499–83, different amounts were reported on the 1977 and 1978 returns, despite the reporting of correct amounts by the Partnership on the Form K-1 supplied to petitioners. There also appears to be a small error in the reporting of the investment interest expense deduction in docket No. 5073–83.

[32]In docket No. 1475–83, respondent disallowed only petitioners' share of Partnership losses for 1976, apparently because petitioners did not deduct any Partnership investment interest expense on their return, unlike all of the other petitioners before us.

nership at all times retained legal title and the right to the equipment's residual value at the end of the lease terms. Thus, it is argued, the Partnership bore the risk that its initial cash outlay of $1.2 million could be lost entirely, and it also possessed a reasonable opportunity for profit, in that the residual value could be substantially in excess of the cash investment.

Respondent's position is that the instant equipment leasing transaction is merely a tax-avoidance scheme, and that the Partnership's ownership of the equipment should be disregarded for tax purposes. In support of this position, respondent urges three legal tests: (1) The leasing arrangements do not satisfy the tests of substance established by the Supreme Court in *Frank Lyon Co. v. United States*, 435 U.S. 561 (1978); (2) the Partnership did not acquire the benefits and burdens of owning the equipment; and (3) the Partnership did not assume the substantive risk of loss of value. Respondent's conclusion therefrom is that the true characterization of these transactions is either a financing arrangement or a sale of the equipment by the Partnership to the lessees. Respondent focuses principally upon the contention that the instant transaction was intended merely to break even, so that petitioners were merely purchasing tax writeoffs. We view respondent's three arguments as essentially interconnected. Fundamentally, respondent contends that the Partnership's ownership of the equipment was so devoid of economic substance that it should be disregarded.

In ascertaining the proper characterization of the Partnership's interest, the parties' characterization of the form of the transaction should be respected so long as the lessor retains significant and genuine attributes of a traditional lessor. *Frank Lyon Co. v. United States, supra* at 585. The existence of tax benefits accruing to its investors does not necessarily deprive a transaction of economic substance. *Frank Lyon Co. v. United States, supra* at 574, 581; *Commissioner v. Brown*, 380 U.S. 563, 579–580 (1965) (Harlan, J., concurring); *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985); *McLane v. Commissioner*, 46 T.C. 140, 145 (1966), affd. per curiam 377 F.2d 557 (9th Cir. 1967), cert. denied 389 U.S. 1038 (1968). But where the transactions were entered into without any economic purpose

other than favorable tax consequences, the courts have appropriately disregarded the form. E.g., *Knetsch v. United States*, 364 U.S. 361 (1960); *Higgins v. Smith*, 308 U.S. 473 (1940); *Gregory v. Helvering*, 293 U.S. 465 (1935); *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981); *Derr v. Commissioner*, 77 T.C. 708 (1981); *Hager v. Commissioner*, 76 T.C. 759 (1981); *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982); *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976).

Respondent's position that the instant transaction in reality was a sale is necessarily predicated upon the theory that the equipment would be effectively "used up" so that there would be nothing to be returned by the lessees to the Partnership at the end of the lease terms. This perception is, however, belied by the stipulation and the evidence before us. The parties have stipulated that the computers were expected to have a useful life of at least 3 years beyond the lease terms and that a residual value of at least 14 percent was reasonably expected, which amount would have enabled the Partnership to recoup its original cash investment and to break even. The record as a whole, moreover, supports a reasonable potential for considerably higher residual values—as much as 30 percent.[33] Thus, as we have found, the Partnership engaged in the activity with the objective of making a profit.[34]

Moreover, there is no dispute that the Partnership at all times retained its rights as owner of the equipment. While the Partnership did contract away a number of risks with respect to the equipment, net leases are commonly used today and do not necessarily reflect an absence of ownership. See *Hilton v. Commissioner*, 74 T.C. 305, 348 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982); *LTV Corp. v. Commissioner*, 63 T.C. 39, 49–50 (1974). Similarly, the

---

[33]See notes 22–23 and accompanying text *supra*.

[34]Respondent contends that residual value is only one factor among many to be examined in determining whether there was an opportunity to make a profit. In support thereof, he cites *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982). In that case, we did not indicate that residual value was insignificant; rather, we held that subsequent events resulting in unexpected profits did not generate economic substance where the sales resulting in those profits were not arm's-length transfers, but mere manipulations to create a paper profit. 74 T.C. at 1558–1562. We concluded, therefore, that the indebtedness by far exceeded the fair market value of the property so that the debt could not be included in basis. Such obviously is not the case here.

absence of significant positive net cash-flow during the lease terms is a neutral factor. See *Hilton v. Commissioner, supra.* On the other hand, the Partnership did retain a significant benefit and burden with respect to the equipment—that residual value would either generate a profit or a loss.[35]

Consequently, there is no basis for concluding that the lessees acquired an equity in the instant equipment.[36] The lease terms were substantially shorter than the equipment's useful lives, as the parties have stipulated, which is characteristic of a lease. See, e.g., *Bowen v. Commissioner*, 12 T.C. 446, 459 (1949); *Holeproof Hosiery Co. v. Commissioner*, 11 B.T.A. 547, 556 (1928).[37] Reasonable rental payments, such as those here, also are indicative of a bona fide lease in that they are not likely to be payments by the lessee for purchase of equity in the property. See *Frank Lyon Co. v. United States*, 435 U.S. 582 (1978); *Oesterreich v. Commissioner*, 226 F.2d 798, 803 (9th Cir. 1955), revg. a Memorandum Opinion of this Court; *Belz Investment Co. v. Commissioner*, 72 T.C. 1209 (1979), affd. 661 F.2d 76 (6th Cir. 1981); *Haggard v. Commissioner*, 24 T.C. 1124, 1128 (1955), affd. per curiam 241 F.2d 288 (9th Cir. 1956). The parties' treatment of the leases as such on their books and records—including treatment of lease payments by at least some of the lessees as deductible business expenses—is an additional factor indicating a bona fide lease. See *Benton v. Commissioner*, 197 F.2d 745, 753 (5th Cir. 1952).

Upon conclusion of the leases, the equipment was to be physically returned to (or as directed by) the Partnership. In the three instances where the lessees had options to purchase or re-lease, the lessees were required to pay fair market value or rental. Cases which hold that equity is being transferred to a lessee in instances where exercise of an option to purchase is inevitable because the option price is nominal or small are simply not in point here. See *American Realty Trust v. United States*, 498 F.2d 1194, 1199 (4th Cir. 1974); *Oesterreich v.*

---

[35]We note that, even though some of petitioners' cash investment could be said to have been expected to be recouped by means of tax benefits in the early years, the expected net tax benefits over the 9-year period, if coupled with a very low residual value, would have resulted in an out-of-pocket loss for investors.

[36]The lessee acquires an equity when he acquires something of value in relation to the overall transaction, other than the mere use of the property. *Judson Mills v. Commissioner*, 11 T.C. 25, 32 (1948); *Reade Mfg. Co. v. Commissioner*, T.C. Memo. 1973–259.

[37]See also *Davis v. Commissioner*, T.C. Memo. 1978–348.

*Commissioner, supra; Belz Investment Co. v. Commissioner, supra.*[38] See also *Smith v. Commissioner,* 51 T.C. 429, 439 (1968) (exercise of option compelled by agreement with third party). In *LTV Corp. v. Commissioner, supra,* we rejected respondent's argument that the existence of an option to purchase indicated a conditional sale, because the option price was "comparable with the computer's estimated fair market value at the end of the lease term." 63 T.C. at 50.[39]

The facts here are distinguishable from those in *Swift Dodge v. Commissioner,* 76 T.C. 547 (1981), revd. 692 F.2d 651 (9th Cir. 1982), where our holding that the lease agreements before us were not in fact conditional sales contracts was reversed by the Court of Appeals. While in some respects the obligations and rights of the lessee, there, resemble those of the lessees, here, the crucial distinction—and an important ground for the Court of Appeals' reversal of our decision—was that the *Swift-Dodge* leases were "open-ended": The lessee at lease end was required to pay the lessor the amount, if any, by which the "depreciated value" (set forth in the lease) exceeded its actual value; in the event that the actual value exceeded the depreciated value, the lessee received the difference. Thus, the Court of Appeals concluded, the lessee assumed the risk of depreciation, and the arrangement in reality was a conditional sale. 692 F.2d at 654. In contrast, the leases here were closed-ended in that the Partnership bore the risk at the end of the leases that the residual value would not be sufficient to recoup its cash outlay. At the same time, the Partnership possessed the potential for gain if residual values exceeded its investment. See *Swift Dodge v. Commissioner,* 76 T.C. at 568–569 n. 11.[40] For similar reasons, our decision in *Leslie Leasing Co. v. Commissioner,* 80 T.C. 411 (1983), likewise is distinguishable.

---

[38]See *Reade Mfg. Co. v. Commissioner,* T.C. Memo. 1973–259; *Beaudry v. Commissioner,* T.C. Memo. 1972–214.

[39]See also *Cal-Maine Foods, Inc. v. Commissioner,* T.C. Memo. 1977–89 (absence of provision that a portion of the monthly payments would be credited against option price was factor indicative of lease).

[40]We stated in our opinion in *Swift Dodge v. Commissioner,* 76 T.C. 547 (1981), revd. 692 F.2d 651 (9th Cir. 1982), that the risk of residual value fluctuation is only one factor among many to be considered in deciding the lease-versus-sale question, but there were a number of factors that mitigated the lessees' assumption of that risk in that case. 76 T.C. at 569, 574. In contrast, we believe that the Partnership's assumption of the residual value risk here is of controlling significance on the facts currently before us. Consequently, we need not decide whether we should follow our opinion or that of the Court of Appeals in *Swift Dodge.*

Nor are we persuaded by respondent's contention that the fact that the Partnership's debt obligations would be extinguished at lease end shows that a sale was intended. This Court has upheld lease transactions where total rentals over the lease terms equaled or even exceeded the total cost of the equipment. E.g., *Kansas City Southern Railway Co. v. Commissioner*, 76 T. C. 1067, 1102–1103 (1981). Rent during an initial lease term geared to the cost of interest and mortgage amortization is not, in and of itself, much more than a neutral commercial reality. *Dunlap v. Commissioner*, 74 T.C. 1377, 1436 (1980), revd. on another issue 670 F.2d 785 (8th Cir. 1982); *Hilton v. Commissioner*, 74 T.C. 305, 348 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982).

With regard to respondent's "financing arrangement" theory, we see little to distinguish this case from *Frank Lyon Co. v. United States*, *supra*, where the Supreme Court upheld the form of a transaction structured very similarly to the one before us but in some respects not as strongly indicative of a lease transaction. For example, in this case the lessor's initial equity ($1.2 million) represented approximately 13 percent of the equipment's total cost ($9,070,234), whereas in *Frank Lyon*, it represented about 6 percent. The potential lease term in *Frank Lyon* aggregated 65 years, which probably was close to the useful life of the building; here, the lease terms were only 8 years, and the computers were expected to have useful lives of at least 3 years beyond lease termination. In *Frank Lyon*, the renewal rental was fixed at approximately one-half of the initial term, whereas, here, renewal rental was at fair market rent. Consequently, even more than in *Frank Lyon*, the Partnership, here, retained "significant and genuine attributes of the traditional lessor status." 435 U.S. at 585.

In addition, the tests of substance set forth in *Frank Lyon* are met here. Respondent argues that the fact that the notes are nonrecourse evidences a lack of true substance, but, contrary to respondent's contentions, we have stated repeatedly that we do not believe that the nonrecourse nature of notes is necessarily more than a "neutral factor," since nonrecourse liabilities are commonly used in modern transactions.[41] See

---

[41]We note that we are not presented here with the situation typical of many tax shelter proceedings where the purchase price of the property or the nonrecourse liability was substantial-

*Dunlap v. Commissioner, supra* at 1435; *Hilton v. Commissioner, supra* at 363.

The "business reality" presented to the Partnership was a potential for profit upon realization of residual value at the end of the lease term.[42] The business purpose to the lessees,[43] at least in part, appears to involve the fact that the rent paid to the Partnership was less than that which would have been paid to IBM if the equipment had been rented directly from IBM. Moreover, as respondent concedes, the lessees were spared the capital investment, which is true with any lease. While respondent contends that the lessees could have purchased the equipment themselves, either outright or by means of debt financing, this sort of speculation is not appropriate to our analysis. As the Supreme Court said in *Frank Lyon*, "a transaction must be given its effect in accord with what actually occurred and not in accord with what might have occurred." 435 U.S. at 577.

But most importantly, the two interrelated remaining factors enunciated by the *Frank Lyon* Court—that the transaction contain "economic substance" and be "imbued with tax-independent considerations"—have been met here. As we have already discussed, there was a reasonable potential for profit which clearly constitutes the requisite substance. Unlike respondent, we find the emphasis in the private placement memorandum upon tax benefits expected from investment in the Partnership to be reasonable and normal under the circumstances. As we have noted, the existence of tax benefits does not necessarily deprive a transaction of economic substance. Moreover, the absence of any concrete assurances of profit to the investors does not indicate to us that no profit was intended. Rather, this reflects the conservative requirements of securities laws. Similarly, the Exxon restructure—whereby the Partnership avoided the depreciation recapture and income realization that would have occurred in the event of

---

ly in excess of the property's fair market value. See, e.g., *Odend'hal v. Commissioner*, 80 T.C. 588 (1983), affd. 748 F.2d 908 (4th Cir. 1984); *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Estate of Franklin v. Commissioner*, 64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). See note 49 and accompanying text *infra.*

[42] As we noted in our findings, the parties stipulated that the Partnership's "business purpose" was to acquire and lease the equipment "and, at the end of these initial leases, to re-lease, sell or exchange the equipment on a basis which would result in the largest possible gain to the Partnership."

[43] See *Frank Lyon Co. v. Commissioner*, 435 U.S. 561, 583 (1978).

termination by Exxon and sale of the equipment by the Partnership—indicates to us not that tax consequences were the sole motivating force but that they quite appropriately were one factor considered at that stage of the transaction.

We conclude that the instant transaction clearly passes muster. Its economics were such that, while *tax savings* were expected to—and did—accrue to Partnership investors in the early years, at some point a "turn around" would be—and was—reached whereby depreciation and interest deductions would be less than income from the leases, and the investors would have to *pay taxes* on the Partnership profit. Consequently, the estimated net tax savings over the Partnership life—$14,324 for a 70-percent taxpayer[44]—were considerably less than the investor's $30,000 cash investment. From this we conclude that an investor in this Partnership could not have entered into this transaction solely for its tax benefits.[45] The potential for profit,[46] on the other hand, was substantial as we have found. We conclude, therefore, that this case is controlled by the result in *Frank Lyon*[47] and that the form of this transaction should be respected.

Both parties attempt to emphasize the significance of our recent opinion in *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985), which involved a computer purchase-and-leaseback arrangement[48] on the surface appearing to be similar to the leasing

[44]See table, p. 418 *supra*.

[45]In our recent decision of *Estate of Baron v. Commissioner*, 83 T.C. 542 (1984), we noted, in the context of sec. 183, that a disparity between estimated before-tax profit and net tax benefits is a factor to be considered in the determination of profit objective. 83 T.C. at 558. Such an analysis, here, would further confirm the economic substance of the transaction.

[46]On the facts before us, profit is measured not against the full purchase price including the nonrecourse note, since payments on that note were in all events guaranteed by the lease or termination payments. Rather, it is measured against the investors' cash outlay. Cf. *Wildman v. Commissioner*, 78 T.C. 943, 954 (1982).

[47]We note that our opinion in *Hilton v. Commissioner*, 74 T.C. 305, 362–363 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982), found *Frank Lyon* to be distinguishable because of the following: (1) Rent during the initial lease term in *Hilton* was only sufficient to amortize 90 percent of the note principal, so that there was a substantial balloon at the end of the lease term; (2) the rent in *Hilton* was not based on fair rental value; (3) none of the investors' funds in *Hilton* went to the seller/lessee for purchase of the property; (4) the taxpayers, there, could not dispose of the property at a profit; (5) the contrived nature of the Partnership's formation and orchestration in *Hilton*. These distinctions lend further support for our view that the case before us is factually similar to *Frank Lyon* and thus should be controlled by its result rather than by the result in *Hilton*.

[48]Although the computer purchased in *Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985), was an IBM System 370, none of the models at issue in this proceeding are of the same model as the one in *Rice's Toyota*. The testimony therein concerning residual value thus is of no relevance to this proceeding.

transaction at issue here. In analyzing the transaction, we indicated that the transaction either had to meet the subjective "business purpose" test, or it had to satisfy a more objective "economic substance" test indicating a "realistic opportunity for economic profit which would justify the form of the transaction." 81 T.C. at 202–203 & n. 17. We concluded that neither test had been met in that case and that the transaction was a sham. In affirming, the Court of Appeals recently confirmed the use of this test, noting in connection with the "economic substance" inquiry that the most credible estimates in the record indicated that residual value of the computer was not sufficient to earn a profit. The facts in the instant case are clearly distinguishable. We have found to the contrary that a profit was reasonably likely so that the economic substance test has been fairly met.

Respondent's reliance upon *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982), likewise is misplaced. In both of those cases, the issue was whether nonrecourse debt was properly included in cost basis for the property involved in each case. We expressly found a lack of genuine indebtedness because the purchase prices of the properties were not shown to have equaled their fair market values. Under such circumstances, the Court of Appeals indicated in affirming our *Estate of Franklin* decision that the purported purchaser of the property had no incentive to pay off the nonrecourse note because by abandoning the transaction—and the property securing the debt—the taxpayer "can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase." 544 F.2d at 1048.

This "prudent abandonment" test referred to by respondent has no place here where the parties have stipulated that the Partnership paid fair market value for the equipment.[49] Moreover, the Partnership clearly did not have an incentive to abandon the property when it had entered into leases virtually guaranteeing that monthly debt payments would be made,

---

[49]This is a characteristic of the transaction further distinguishing it from that in *Rice's Toyota World, Inc. v. Commissioner, supra*, where we found that the taxpayer paid more than fair market value for the equipment because he purchased only a 70-percent interest. 81 T.C. at 209. Even after 5 percent for brokers' fees is taken out, the Partnership owned 95 percent of residual value here.

either where the leases ran their full course or where they were terminated prematurely.[50]

Respondent's position is simply not supported by the record in this case. The transactions were genuine leases for all purposes including Federal income tax.[51] We hold for petitioners on this issue.[52]

### Amortization of Hutton Fees

In view of our holding that the Partnership is the true owner of the equipment for tax purposes, we now must address the second issue: Whether the Partnership's payment to E.F. Hutton of $102,000 as a commission for obtaining offers to

[50]We note that respondent attempts to demonstrate in charts appended to one of his briefs that, should the leases have been terminated prematurely by the lessees and the debts paid off by means of the termination payments, the Partnership would not have recouped its initial investment and started to build up equity until fairly close to the end of the lease terms. However, we conclude that these charts are unpersuasive in that: the residual values used therein are artificially low because they employ an "averaging of averages" of limited material in evidence; they ignore the fact that termination rights did not arise until well into the lease terms; and the leases clearly were not entered into by the Partnership in order to see them terminated prematurely, but were intended to run their full courses in the absence of some unforeseen circumstances. These charts do not, therefore, show an absence of equity such as was intended by *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and its progeny, where the likelihood that the debt would be paid was the fundamental issue.

[51]At the Court's request, the parties have stipulated the extent to which the requirements of Rev. Proc. 75–21, 1975–1 C.B. 715, have been met. That revenue procedure established guidelines under which an advance ruling on a leveraged lease would be issued. All of the leases, here, satisfy all of the requirements of that revenue procedure, except for Guideline No. 1, which requires that the lessor must have a 20-percent minimum unconditional amount at risk in the property when the lease begins, throughout the entire lease term, and at the end of the lease term. Here, the equipment had sufficient useful life at all times to satisfy Guideline No. 1, and the Partnership had more than 10- but less than 20-percent equity in the equipment initially and during the term of the leases. Given these facts, we are further persuaded that respondent's position is unsound. The spirit of this "safe haven" revenue procedure—attempting to ascertain "true" ownership of the equipment—certainly has been met. The discrepancy between 10-plus-percent equity, here, and the 20 percent required by the guideline does not justify respondent's position.

[52]An issue not raised or briefed by the parties, but alluded to by some of the witnesses, is whether, in determining the economic viability of the instant transaction, we are required to discount the expected residual value of the equipment back to 1975 dollars. In the absence of statutory mandate, we decline to do so. While we are aware of our footnote 23 in *Hilton v. Commissioner*, 74 T.C. 305, 353 n. 23 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982), cert. denied 459 U.S. 907 (1982), we note that the method employed therein was dictum in the context of circumstances bordering on the egregious.

Moreover, we do not feel competent, in the absence of legislative guidance, to require that a particular return must be expected before a "profit" is recognizable, the necessary conclusion to be drawn if we were to discount residual value. As stated in sec. 1.183–2(b)(9), Income Tax Regs., in a closely related context, "the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit." Our sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction. Since the potential profit here was more than de minimis, we are satisfied that petitioners should prevail. See *Lemmen v. Commissioner*, 77 T.C. 1326, 1342–1347 & nn. 22 & 24 (1981).

purchase Partnership units was properly amortized over a 9-year period.

There appears to be no dispute between the parties that fees incurred by partnerships for syndication of their shares are nondeductible expenses which must be capitalized. *Blitzer v. United States*, 231 Ct. Cl. 236, 684 F.2d 874 (1982); *Derr v. Commissioner*, 77 T.C. 708, 733–734 (1981); *Kimmelman v. Commissioner*, 72 T.C. 294, 304–306 (1979). See 4A J. Mertens, Law of Federal Income Taxation, sec. 25.35, at 177 (1979 rev. & Supp. 1984). The question before us is what is the proper treatment of these capitalized costs. Petitioners contend that the Partnership should be permitted to deduct them in equal amounts annually over the Partnership's 9-year life. Respondent, on the other hand, asserts that amortization is inappropriate and that, while these costs must be capitalized, they may only be recovered upon liquidation of the Partnership. This Court has not yet decided whether amortization of syndication expenses is appropriate.

In the absence of precedent directly on point, we look to the rule in a closely analogous context. Fees paid by corporations in connection with stock issues (such as brokers' commissions) historically have been treated as a reduction of the capital received by the corporation upon issuance of its stock. *Surety Finance Co. of Tacoma v. Commissioner*, 77 F.2d 221 (9th Cir. 1935), affg. 27 B.T.A. 616 (1933); *Barbour Coal Co. v. Commissioner*, 74 F.2d 163 (10th Cir. 1934), cert. denied 295 U.S. 731 (1935); *Simmons Co. v. Commissioner*, 33 F.2d 75 (1st Cir. 1929), affg. 8 B.T.A. 631 (1927), cert. denied 280 U.S. 588 (1929). Accordingly, such expenses always have been held to be nonamortizable. The rationale for this rule was explained by the U.S. Court of Appeals for the Tenth Circuit, as follows:

the function and scope of this [amortization] statute is to allow a deduction for the exhaustion of assets such as machinery, buildings, or other forms of personalty which depreciate through wear and tear. It has no application here because the expenditure in question was not to acquire property of that kind, but for capital in the form of cash for use in the business. It was not an exhaustible or depreciable asset. But it is said that the right to use the money thus acquired was a property right which is exhausted ratably with the passage of time and consequently an aliquot part of the expenditure made in acquiring it should be allowed as a deduction by way of exhaustion for each year during that period. The argument overlooks the controlling consideration that such a commission is a capital expenditure to be charged

against the proceeds of the stock, not recovered from operating earnings. It merely reduces the net returns from the sale of the stock and reduces the available capital. It has no relation to operating expenses. It is equivalent for income tax purposes to the sale of stock at a discount. There can be no substantial difference between the two. The discount in the one instance represents the difference between the par value of the stock and the amount received for it; the commission represents that difference in the other. A capital expenditure cannot be charged income. [*Barbour Coal Co. v. Commissioner, supra* at 164.]

In 1954, section 248 was enacted as part of the new Code, permitting corporations to elect to amortize organizational expenses over a period of 60 months or more. Pub. L. 83–591, 68A Stat. 76. However the legislative history of this section indicates that it is not applicable to fees paid by the corporation in connection with stock issues, in conformity with prior case law and generally accepted practice, since such fees were not considered to be of an amortizable character. H. Rept. 1337, 83d Cong., 2d Sess. 31, A64 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 37, 224 (1954). See sec. 1.248–1(b)(3)(i), Income Tax Regs. We see no reason not to follow the rule applied in the corporate context, particularly in view of the close similarity between the types of expenses incurred by partnerships and corporations in the course of raising capital.[53] Accordingly, we hold that these Partnership syndication costs may not be amortized.

The propriety of our holding is confirmed by the fact that Congress as part of the Tax Reform Act of 1976 enacted new section 709 to the Code. Pub. L. 94–455, 90 Stat. 1547. Section 709(a), which was enacted after the instant syndication fees were incurred and paid, provides as follows:

SEC. 709(a). GENERAL RULE.—Except as provided in subsection (b), no deduction shall be allowed under this chapter[54] to the partnership or to any

---

[53]An argument might be made that these expenses are similar to loan costs, which are capitalized and deducted pro rata over the life of the loan. *Detroit Consolidated Theatres, Inc. v. Commissioner*, 133 F.2d 200 (6th Cir. 1942), affg. per curiam a Memorandum Opinion of the Board of Tax Appeals; *Goodwin v. Commissioner*, 75 T.C. 424, 442 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); *Cagle v. Commissioner*, 63 T.C. 86, 97 (1974), affd. 539 F.2d 409 (5th Cir. 1976). While this theory might be persuasive if we were writing on a clean slate, we cannot overlook the fact that the law in the corporate context—which clearly provides a closer analogy—is to the contrary.

[54]We note that the legislative history of this provision refers to deductions "under the partnership tax provisions (subchapter K of the code)," as contrasted with the broader language in the statute "under this chapter," which on its face encompasses amortization under sec. 167. S. Rept. 94–938, at 94, 1976–3 C.B. (Vol. 3) 132. See McGuire, "Can the Syndication Costs of a

partner for any amounts paid or incurred to organize a partnership or to promote the sale of (or to sell) an interest in such partnership.

This new section was designed primarily to bring the treatment of "guaranteed payments" made to general partners for services rendered in connection with syndication and organization of limited partnerships in conformity with the treatment of similar expenses by corporations. S. Rept. 94–938, at 94, 1976–3 C.B. (Vol. 3) 132.[55] In codifying existing case law that such payments to partners were not deductible, the House report noted without comment the rule discussed above concerning the "netting" of stock issuing expenses. H. Rept. 94–658, at 121 n. 4, 1976–3 C.B. (Vol. 2) 813. There is no indication in the legislative history that Congress believed that it was changing the law or that partnership syndication fees had previously received different treatment from stock issuing expenses and been amortizable. Moreover, while it is not entirely clear whether the nondeductibility provision of section 709(a) is applicable to syndication fees incurred and paid during 1975[56] (such as those before us), nevertheless Congress has seen fit to preclude such deductions at least for all years thereafter. In view of Congress' clear awareness of prior case law both in the partnership and corporate contexts and its apparent intent generally to codify that law, we do not think that a different rule should be applied to the syndication fees before us.

We are aware that the Court of Claims recently held that a "front-end" administrative management fee which was in part "ancillary to the organization of the limited partnership and

---

Partnership be Amortized? An Analysis of Authorities," 59 J. Tax. 208 n. 2 (1983). However, a reference to subch. K also necessarily includes those deductions flowed through to partners by reason of sec. 702(a)(7) (now sec. 702(a)(8))—such as depreciation and amortization. Thus this inconsistency is of no consequence here.

[55]Under sec. 709(b), a partnership may elect to amortize organization fees over a period of not less than 60 months in a manner similar to sec. 248, but—as was true of its corporate counterpart—this amortization provision was clearly not intended to be applied to syndication fees. S. Rept. 94–938, *supra* at 94, 1976–3 C.B. (Vol. 3) at 132.

[56]Sec. 709 (a) is applicable in the case of partnership taxable years beginning after Dec. 31, 1975. Consequently, on its face, this provision appears to be applicable to the years at issue here. However, the Conference report states:

"The conferees intend that no inferences should be drawn as to the deductibility (when paid) of partnership organization and syndication fees paid or incurred in taxable years beginning before January 1, 1976."

S. Rept. 94–1236, 94th Cong., 2d Sess. 421, 1976–3 C.B. (Vol. 3) 825. Because the conclusion we have reached is consistent with that required by the statute, we need not decide this question.

syndication of its shares" was not currently deductible but was "a capital expenditure to be amortized over the (50 year) life of the partnership." *Blitzer v. United States*, 231 Ct. Cl. 236, 684 F.2d 874, 893 (1982). However, we do not feel compelled to follow that ruling, despite our respect for the decisions of that court. Respondent conceded in *Blitzer* not only that capitalization of these fees was appropriate (as he does here), but also that, at most, amortization over the partnership's 50-year life was called for, a position argued by respondent here to be incorrect. Thus the Court of Claims did not have to address the amortization question in an adversarial context, nor did it approach the issue from a legal standpoint: It reached the conclusion argued for by respondent in the alternative.[57]

Accordingly, we conclude that respondent correctly determined that the Partnership could not amortize its syndication costs.

*Decisions will be entered under Rule 155.*

---

APPENDIX A

Below is a list of petitioners in this consolidated proceeding, along with their places of residence when their petitions were filed and the number of Partnership units owned by them.

| *Name* | *Residence* | *Number of partnership units owned* |
| --- | --- | --- |
| Imogene Thomas (individually and as personal representative of deceased husband, Jerry Thomas) | Jupiter, FL | 1 |

---

[57]The new U.S. Claims Court more recently addressed the question of amortization of organization and syndication fees in the context of respondent's argument that *Blitzer* was wrongly decided. Stating that it had no authority to overrule *Blitzer*, that court simply held that amortization of syndication fees over the life of one of the partnership's office buildings ("a tangible asset with a useful life related to the syndication fee") was appropriate. *Sartin v. United States*, 5 Cl. Ct. 172, 179 (1984). Thus, there was no discussion concerning the legality of amortization in that opinion either.

| Name | Residence | Number of partnership units owned |
|------|-----------|-----------------------------------|
| Robert P. Kuhn and Janice K. Kuhn | Cincinnati, OH | 1/4 |
| Henry F. Goller and Margaret K. Goller | Orchard Park, NY | 1/2 |
| Robert C. Baesel and Jeanne T. Baesel | Cincinnati, OH | 1/4 |
| Warren J. Welling and Alice M. Welling | Palm City, FL | 1/4 |
| George E. Schultz and Irene L. Schultz | Milford, OH | 1/4 |
| Roy B. Culler, Jr., and Dorothy P. Culler | High Point, NC | 1 |
| Neil C. Schauf | Santa Fe, NM | 2 |
| Marilyn M. Schauf | Stinson Beach, CA | - - - |
| James W. Powell and Annie J. Powell | Fort Lauderdale, FL | 1 |
| Elbert W. Phillips and Elizabeth C. Phillips | North Tonawanda, NY | 1/2 |
| William L. Albritton and Mary S. Albritton | Baton Rouge, LA | 2 |
| Raymond Leven and Nettie Leven | Maplewood, NJ | [1]2 |
| Edward Waters and Jane C. Waters | Farmington, CT | 1 |
| Bayard C. Tullar and Teresa Tullar | Wellsville, NY | 1 |

---

[1]The supplemental stipulation indicates that Raymond Leven, petitioner in docket No. 16415–82, owned one Partnership unit, but an examination of the Form K-1 prepared by the Partnership indicates that Mr. Leven owned two units. To the extent of this inconsistency, we will not follow the supplemental stipulation.

APPENDIX B

| | 1975[1] | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|---|---|---|
| Rental receipts | $118,188 | $1,583,166 | $1,598,158 | $1,598,158 | $1,598,158 | $1,598,158 | $1,598,158 | $1,564,249 | $942,062 |
| Debt services | (46,745) | (1,464,788) | (1,515,304) | (1,515,304) | (1,515,304) | (1,515,304) | (1,515,304) | (1,481,130) | (802,602) |
| Projected cash to partnership | 71,443 | 118,378 | 82,854 | 82,854 | 82,854 | 82,854 | 82,854 | 83,119 | 139,460 |
| Projected partnership operating expenses[2] | (7,500) | (79,000) | (79,000) | (79,000) | (79,000) | (79,000) | (79,000) | (78,000) | (60,000) |
| Projected cash to limited partners[3] | 63,943 | 39,378 | 3,854 | 3,854 | 3,854 | 3,854 | 3,854 | 5,119 | 79,460 |

[1]1975 is not a year at issue.

[2]Includes fees paid to Alanthus in connection with the Exxon lease, fees paid to the general partner pursuant to the Partnership articles and legal and accounting fees paid to third parties in the course of administrating the leases and the Partnership.

[3]Due to higher than projected legal and accounting expenses, cash was actually distributed to the limited partners only in 1976 in the aggregate amount of $8,897.88. It was anticipated that a substantial portion of the 1975 and 1976 net cash-flow would be used to pay startup and acquisition expenses.