L.W. HARDY CO., INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
L.W. Hardy Co. v. Commissioner
Docket Nos. 12736-81, 24243-81.
United States Tax Court
T.C. Memo 1987-63; 1987 Tax Ct. Memo LEXIS 59; 52 T.C.M. (CCH) 1540; T.C.M. (RIA) 87063; January 29, 1987. Stephen E. Silver and Brad S. Ostroff, for the petitioner. David W. Otto, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Year
Deficiency
1975
$1,022,340
1976
497,878
1977
68,830
1978
157,322
Following concessions by the parties, [1] the issues for decision are: (1) Whether the sale and leaseback transactions in question were part of a tax avoidance scheme without business purpose or economic substance and which must be disregarded for Federal income tax purposes; and (2) Whether petitioner held sufficient attributes of ownership to be treated as the owner, for Federal *60 tax purposes, of property that was the subject of the sale and leaseback transactions. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Background
Petitioner L.W. Hardy Co., Inc. ("petitioner") is an Arizona corporation with its principal place of business at Kingman, Arizona. During the years in issue, the primary business of petitioner was the mining and sale of turquoise. Petitioner mined turquoise at various locations in Arizona, and after the application of certain processes to the turquoise, sold it on the wholesale market. Petitioner was formed in 1968 by Leonard Hardy ("Hardy") and his wife Geraldine Hardy, who are the controlling shareholders of petitioner. Beginning in 1974, the worldwide market *61 for turquoise increased substantially primarily due to an increased demand for Indian and turquoise jewelry. Petitioner was a primary beneficiary of the increased demand since it controlled much of the world's production of turquoise. By 1975, the gross revenues of the company had increased dramatically to approximately $13,000,000. The market for turquoise peacked in 1975. GCC
In 1974, Greyhound Computer Corporation ("GCC"), a subsidiary of the Greyhound Corporation ("GHC"), whose stock was publicly traded, was one of the largest IBM computer equipment leasing corporations in the United States, with operations in Canada, Mexico, the United Kingdom, and Europe. GCC owned computer equipment with a cost basis of $425,000,000, comprised if IBM System 360 and 370 equipment, as well as computer equipment from various other manufacturers, and operated 10 data centers in the United States providing computer services to customers. In 1973, GCC purchased the stock of Bresnahan Computer Corporation (Bresnahan"), Traleascorp, Inc. ("Traleascorp"), and its sister corporation, D.S., Inc. In 1974, GCC purchased the stock of EDP Resources, Inc. ("EDP"). GCC made these purchases to *62 acquire the underlying portfolios of computer equipment owned by these companies. Richard Stephan ("Stephan"), a Certified Public Accountant, was vice president and controller of GCC. In late 1973 or early 1974, Stephan was contacted by someone of E. F. Hutton in Rochester, New York, about the possibility of a sale and leaseback of computer equipment with GCC. Stephan had meetings with E. F. Hutton in Rochester during the summer and fall of 1974 to discuss a possible sale and leaseback transaction which E. F. Hutton would syndicate. The transaction was not consummated. However, a sale and leaseback transaction with E. F. Hutton was consummated at a later date. Clarence Renouard
Clarence Renouard ("Renouard"), who first brought petitioner and GCC together, had a substantial background in computer sales and computer price performance analysis. In 1972, Renouard established Hamilton Investment Co., which was predominantly involved in real estate transactions and personal property investments. Renouard and Stephan began discussing the possibility of Hamilton Investment Co. representing GCC in the sale and leaseback of computer equipment in Arizona. Stephan was interested *63 in entering into sale and leaseback transactions with Arizona investors, believing that transactions with local investors could be structured with smaller overhead than the E. F. Hutton transaction. Renouard was retained by GCC in February 1975, to represent GCC in the sale and leaseback on IBM 360 and plug compatible computer equipment. Renouard was to receive a commission of 2.4 percent of the investor purchase price, of which 1.7 percent would be paid on closing and .7 percent paid throughout the term of the lease. Renouard was also to participate in GCC's marketing fee. In June 1975, Hamilton Investment Co. brought to GCC 3 Arizona investors -- petitioner and 2 individuals -- who entered into sale and leaseback transactions with GCC's subsidiaries. Analysis of Investment
In 1973, John Cronkhite ("Cronkhite"), a partner in Collins, Davies and Cronkhite, Ltd., a law firm specializing in the commercial and tax areas, was retained to represent petitioner on all legal matters. As part of his duties, Cronkhite was requested to review investment opportunities for petitioner. In April 1975, Cronkhite's senior partner, Robert Collins, informed Cronkhite that he had reviewed *64 a computer equipment investment proposal submitted by Renouard to one of his clients, found it meritorious, and suggested that Cronkhite review it for petitioner. Cronkhite reviewed the offering memorandum prepared by Hamilton Investment Co.: Proposed Computer Systems Investment * * * a leveraged computer purchase-leaseback investment potentially capable of generating significant tax savings and other cash profit benefits." The offering memorandum proposed the purchase of used IBM 360 computer equipment for $730,000 from GCC or one of its subsidiaries and the leaseback of the equipment for a term of 74 months. The introductory paragraph of the offering memorandum stated: The proposed computer system "purchase-leaseback" is a "leveraged lease" offering significant economic and tax benefits to the investor. This is especially true for the investor whose combined federal and state income tax rate is in the 54% or higher bracket and who has continuing investmentincome from other sources. A portion of the offering memorandum entitled "Highlights of Proposed Computer Investment" gave a brief summary of the terms of the investment as follows: LESSOR: Individuals, corporations, *65 or partnerships that will invest 9.2% or more of equipment cost as investment equity. LESSEE: Greyhound Computer Corp and/or other subsidiary company. LEASE TERM: 6 years, 2 months with rentals payable monthly. EQUIPMENT: IBM 360 systems equipment (used). EQUIPMENT COST: $730,000 INVESTMENT: $67,000 equity investment (9.2% of equipment cost). FINANCING: $620,000 loan at 12% annual interest, plus a $43,000 balloon note at 12% interest only with principal due in 74th month. FINANCING SOURCE: D.S. Inc., or EDP Resources, or other financing sources. FINANCING TERMS: Notes are non-recourse liability to investor. Debt is secured by assignment of lease rentals and a first lien on the computer equipment by D.S. Inc., EDP Resources, or other financing source. INVESTMENT TAX CREDIT: Not applicable. MANAGEMENT: The lease is a net lease with Greyhound Computer Corp and/or a subsidiary company responsible for all maintenance, insurance, taxes (other than taxes on investor's net income), and other costs in connection with the possession and use of the equipment during the lease term. EQUIPMENT RESALE OR RE-LEASE: Greyhound Computer Corp. or a subsidiary will sell or re-lease *66 the computer equipment at the end of the lease term, under an incentive arrangement, at maximum fair market value for top profit potential to the investor. The tax benefits outlined in the offering memorandum were deductions for depreciation on the equipment and for interest paid on the financing of the purchase price. The memorandum advised, however, that well before the expiration of the lease term, the investment might generate income tax liabilities in excess of the monthly net rental proceeds. Additionally, the memorandum warned that the ultimate disposition of the computer equipment as well as other events might result in a substantial tax liability to the investor. The offering memorandum also included charts reflecting the tax writeoff by year assuming a 54 percent tax bracket (combined Federal and state). As described in the memorandum, a $67,000 cash investment would produce a $34,000 net loss over the 6 year 2 month period of the transaction. The net cash flow to the investor would total $39,738 over the term of the lease and if a 15 percent residual value were realized at the end of the lease term, after paying off the balloon note ($43,000), an investor would realize *67 additional cash before taxes of $43,050. Under these circumstances, the cash received by the investor on the entire transaction would total $82,788 on an investment of $67,000. The following chart is included in the memorandum: INVESTOR
TOTAL EXPENSES AND DEPRECIATION
RENTAL
DEPREC-
INTEREST
INCOME
IATION *
BALLOON
NOTE **
TOTAL
TOTALS
at 12%
at 12%
INTEREST
1 1975 - 7 mos.
$ 90,825
($219,000)
($3,010)
($55,135)
($58,145)
($277,145)
2 1976
155,700
(153,300)
(5,160)
(65,123)
(70,283)
(223,583)
3 1977
155,700
(119,233)
(5,160)
(55,108)
(60,268)
(179,501)
4 1978
155,700
(119,233)
(5,160)
(43,822)
(48,982)
(168,215)
5 1979
155,700
(82,734)
(5,160)
(31,106)
(36,266)
(119,000)
6 1980
155,700
(5,160)
(16,777)
(21,937)
(21,937)
7 1981 - 7 mos.
90,825
(2,580)
(2,456)
(5,036)
(5,036)
$960,150
($693,500)
($31,390)
($269,527)
($300,917)
($994,417)
NET TAXABLE
INVESTOR
INCOME
TAX SAVINGS *
(LOSS) *
(PAYMENTS)
at 54% RATE
1 1975 - 7 mos.
($186,320)
$100,613 2 1976
(67,883)
36,657 3 1977
(23,801)
12,853 4 1978
(12,515)
6,758 5 1979
36,700 (19,818)
6 1980
133,763 (72,232)
7 1981 - 7 mos.
85,789 (46,326)
($34,267)
$18,505 *68 The memorandum described the income tax risks of the investment as including (1) that the tax aspects of the proposed transaction are complex and not completely free from doubt, and (2) that the tax benefits of the investment might not be realized and substantial tax liabilities incurred by reason of changes in the tax law and that proposals for changes are being considered by Congress. The offering memorandum described the economic risks associated with the investment as including that at the end of the lease term the marketing agent might not be able to re-lease or sell the computers on reasonable terms due to, among other things, obsolescence of the computers, and that the investor may suffer an overall economic loss on the purchase, lease, and ultimate disposition of the equipment. The memorandum described at length the residual *69 value aspect of the investment, which would determine whether the investor would realize a profit. The memorandum charted taxable income projections, tax savings, after-tax cash flow and potential earnings from the after-tax cash flow. Cronkhite thoroughly reviewed the offering memorandum with his partner, Robert Collins, met with Renouard on at least 4 or 5 separate occasions and had a similar number of telephone conversations with Renouard to go over various aspects of the proposal. At one of the early meetings, Renouard gave Cronkhite a copy of GCC's 1974 annual report, a copy of "A Special Datapro Report" and a copy of an article from the April 18, 1975, edition of the Wall Street Journal. The Wall Street Journal article, entitled "Planned Outlays for Computers, Related Gear are Slashed by Big Firms as Recession Move," was provided to Cronkhite to show that, at the time, major corporations were looking at IBM 360 equipment rather than newer IBM 370 equipment because of better price and performance considerations. The Datapro Report, published by Datapro Research Corporation, was given to Cronkhite because it provided a description of the features, functions, risks, and *70 benefits of the equipment that would form the portfolio of computer equipment to be acquired from GCC and/or its subsidiaries. GCC's Annual Report was given to Cronkhite to underscore the size and expertise of GCC, GCC's involvement with the IBM 360 line of computer equipment, and the value to an investor of having GCC involved in ths transaction. The Annual Report, however, also identified potential risks which could prevent the recovery of the investment in GCC's computer equipment, including uncertainties as to rental and interest rates and the significant decline in sales values of certain IBM System 360 equipment during 1974. Cronkhite was concerned with the residual value of the equipment, as he concluded early in his review that this would affect whether or not petitioner would realize a profit in this transaction. Accordingly, Cronkhite posed questions to Renouard to satisfy himself that the residual value projections in the offering memorandum were realistic. Cronkhite die not, however, attempt to independently verify the residual value projections. Renouard told Cronkhite that the residual value of the equipment after the 74-month lease term would be conservatively *71 15 to 20 percent of petitioner's purchase price, which would result in a profit of between $62,644 and $121,044. Renouard stated that this would be a profitable transaction and that 15 percent was the minimum residual value as this translated to approximately 5 percent of the original cost of the equipment purchased new. Renouard also told Cronkhite that the ratio of CPUs (Central Processing Units) to peripherals would be one-third to two-thirds and that the mix of equipment was important because peripherals should generally have a longer useful life due to their compatibility with newer generation IBM equipment. In May 1975, Renouard presented Cronkhite with samples of the legal documents which would be used to effectuate the sale and leaseback. Cronkhite met with the principals of petitioner to show them the offering memorandum and explain the transaction, including profit potential and tax deferral. Cronkhite informed them that his law firm believed the investment to be meritorious and recommended that petitioner enter into the investment. The principals questioned Cronkhite about the investment and were informed of his belief that it had a profit potential of approximately *72 $100,000, was a good investment, and had tax advantages. Petitioner, relying on this advice, agreed to purchase $2,920,000 worth of IBM 360 (and plug compatible) equipment from the GCC subsidiaries. A few days prior to closing, Cronkhite reviewed the underlying documentation, including lists of the actual computer equipment petitioner was purchasing, the purchase price allocable to each piece of equipment, the name of the end user, and the location of the equipment, along with a revised offering memorandum for petitioner. Stephan assigned dollar amounts to each piece of equipment, the sum of which made up the purchase price paid by petitioner. Stephan consulted GCC personnel responsible for monitoring computer equipment prices. In determining the purchase price, Stephan took into account the fact that the computer equipment (1) was properly configured into a working system, (2) was (or soon would be) on lease and generating income, (3) did not have to be moved, installed, or tested, and (4) was under maintenance by IBM or other appropriate maintenance vendors. Neither GCC nor Cronkhite sought an independent appraisal. The new offering memorandum presented to Cronkhite before *73 the closing was identical to the earlier one except that it provided for the purchase of $2,920,000 of computer equipment and the down payment and note amounts were changed in proportion to the new purchase price. The residual value schedule, the remarketing and promotional fees, and the various charts were changed to reflect the purchase price. The Transaction
On June 13, 1975, the sale and leaseback transactions between petitioner and GCC and its subsidiaries, EDP, Bresnahan and Traleascorp, were closed. Present for petitioner were Hardy and Cronkhite. Attending for GCC and its subsidiaries were Stephan, GCC attorney L. Gene Lemon, GCC general counsel and secretary Lavan Kasarjian, and Renouard. Three separate equipment purchase agreements were executed by the parties, covering $292,000 of IBM 360 computer equipment (CPUs and peripherals) from Bresnahan, $2,190,000 of IBM 360 computer equipment (CPUs and peripherals) from EDP, and $438,000 of Tracor and Bucode IBM 360 plug compatible computer equipment (peripherals only) from Traleascorp. The purchase agreements were identical except for the purchase price and payment terms and the schedule of equipment purchased. *74 Each purchase agreement contained a schedule identifying the manufacturer, unit, model/feature, and serial number of the computer equipment, the name of the sublessee, location of the equipment, expiration date of the sublease and the purchase price paid by petitioner for the equipment. Each purchase agreement warranted that the equipment was "in good operating condition and repair, is not subject to any known defects or deficiencies and is either (i) on lease and subject to an effective maintenance agreement with the manufacturer, or (ii) on lease and subject to an effective maintenance agreement which is the substantial equivalent of that described in clause (i) hereof." The agreements warranted that the seller owned all of the equipment free and clear of all liens and encumbrances except for the rights of lessees under the leases described in the schedules attached to the agreements. Pursuant to each of the purchase agreements, petitioner made a cash down payment, executed a promissory note secured by the computer equipment pursuant to a separate chattel mortgage and security agreement, and paid a loan fee or points in the following amounts: Seller
Down Payment
Promissory Note
Loan Fee or Points
Bresnahan
$26,800
265,200
$5,190
EDP
201,000
1,989,000
38,925
Traleascorp
40,300
[2] 397,800
7,785
*75 The promissory notes, each executed on June 13, 1975, accrued interest at the rate of 12 percent per annum and obligated petitioner to make 73 equal consecutive monthly payments of principal and interest commencing July 13, 1975, plus a final principal payment with one month's interest on August 15, 1981, in the following amounts: Final Payment
Seller
Monthly Payments
Principal
Interest
Bresnahan
$4,975
$17,200
$172
EDP
37,314
129,000
1,290
Traleascorp
7,463
25,800
258
The three secured promissory notes provided for an extension of the final principal payments by the execution of replacement notes bearing the same rate of interest and payable in installments not less frequent than quarterly and due not more than two years from the date of issue if all of the following conditions were met on the August 15, 1981, due date: (1) the fair market value of the computer equipment was at least equal to the principal amount outstanding on the secured promissory note; (2) petitioner was still the *76 true and lawful owner of the computer equipment, free of all liens, encumbrances, and security interests other than the chattel mortgage and security agreement executed with the payees and any subleases with users of the equipment; (3) the previously executed chattel mortgage and security agreement remained a valid and enforceable lien on the equipment; (4) petitioner was not in default in any of its obligations to the payee; and (5) petitioner had given the payee thirty days' written notice that the final payment on the secured promissory note would be made by the issuance of a replacement note specifying the final maturity. Three separate lease agreements were executed between petitioner, as lessor, and EDP, Bresnahan, and Traleascorp, as lessees, commencing on June 13, 1975, and terminating on August 15, 1981. The agreements provided for monthly rental payments over the 74 month period of the lease due on the 13th day of each month commencing of June 13, 1975, and ending on July 13, 1981, in the following amounts: [3]
Bresnahan
$5,190
EDP
38,925
Traleascorp
7,785
$51,900
*77 The lease agreement provided that the lessee's use of the equipment was restricted to the purpose for which it was designed and that modifications could be made only with petitioner's approval and at lessee's expense. The location of the equipment could be changed by the lessee only if reports showing the location of each item of equipment were furnished by the lessee. At the end of the lease term, the lessee was required, at its own expense, to deliver possession of the equipment to petitioner at the equipment's then location, or in the case of equipment not under sublease, to a mutually agreed upon location. The lease agreement also provided that the lessee was responsible for the cost of maintenance under an IBM or equivalent maintenance agreement, and was required to make the equipment or records relating to performance available for inspection by authorized representatives of petitioner. The lessee was also to assume the entire risk of loss, damage or destruction of the equipment during the term of the lease. Further, the lessee could not encumber the equipment, and was required to pay all assessments, taxes, etc. on the lessor's net income. The lessee was authorized to *78 provide a sublessee with the option to buy the equipment. In the event a sublessee exercised any option to purchase the leased equipment, the lessee could substitute similar equipment of substantially equal value upon prior written notification to petitioner identifying by manufacturer, model, and serial number the substituted equipment and the substituting equipment. All subleases had to be with terms and conditions generally as favorable as the terms and conditions in the lessee's leases on its own equipment. The lessee was required to obtain petitioner's consent to any assignment of the leases and no assignment or subleases relieved the lessee of its obligations under the lease. Petitioner could assign the lease by giving notice of the assignment to the lessee. Title to the equipment was to remain in petitioner, and the lessee was obligated to protect such title from any adverse claims. The lessee was to be entitled to possession of the equipment so long as no event of default occurred. Default was defined as the lessee's failure to make any payment of rent within 10 days of the due date, failure to perform any required act upon 10 days' written notice, or insolvency or *79 bankruptcy of the lessee. Upon default, petitioner could declare the entire remaining rent due and payable, obtain return of the equipment at lessee's expense, re-lease or sell repossessed equipment with 5 days' notice of sale to the lessee. In the event of a re-lease or sale, the lessee was required to pay the difference between the purchase price obtained at sale, or the rental to be received from any third person, and the total unpaid rents for the balance of the lease, together with all costs and expenses, including attorney fees, incurred by petitioner. The lease agreements provided petitioner a security interest in all of the lessee's contract rights under subleases. The monthly payments of rent to petitioner were made by the lessee's wire transferring monthly rental payments to petitioner's account at First National Bank of Arizona. The bank then disbursed, after each such receipt, the monthly payments due by petitioner on the promissory notes. An exclusive marketing agency agreement was executed appointing GCC as petitioner's exclusive marketing agent for a term of two years after the expiration of the original leases. Pursuant to this agreement, GCC was empowerd to, *80 for and on behalf of Owner, to either sell the Equipment, or to lease the Equipment or otherwise to transfer possession or ownership thereof, at the option of the Owner, and Agent shall use its best efforts to negotiate and consummate the most favorable arrangements for such leasing, sale or disposition of the Equipment; provided, however, Agent shall not consummate any such arrangement prior to the delivery of the Equipment to Owner pursuant to the lease agreement entered into by Owner on the same date as the date of this Agreement and concurrently herewith. For these services, petitioner agreed to pay GCC a commission based upon the net proceeds realized from GCC's efforts. The commission schedule set forth the following schedule of payments: It the net proceeds were:
The amount to GCC was:
Between $176,000 and
20% of the excess over $176,000
$232,000    Between $232,000 and
$11,200 plus 25% of the excess
$292,000    over $232,000
Between $292,000 and
$26,200 plus 30% of the excess
$350,400    over $292,000
Between $350,400 and
$43,720 plus 50% of the excess
$408,800    over $350,400
Over $408,800    $72,920 plus 60% of the excess
over $408,800
*81 The term "net proceeds" was defined in the exclusive marketing agency agreement as the total proceeds received from the sale of the equipment and the then present value of all firm rent proceeds due under any sublease of the equipment, less all direct expenses of sale or lease, property taxes, and costs of relocating, insuring, and maintaining the equipment. Any outstanding debt owed by petitioner on the equipment would not reduce "net proceeds." GCC was authorized to collect the proceeds due petitioner as owner from the sale or lease of the equipment, withhold any commissions due GCC under the terms of the agreement, and remit the remainder to petitioner, along with an itemized statement of gross proceeds received, the nature of the transaction, GCC's fee, and all direct expenses and relocation costs charged to petitioner. GCC was permitted to purchase or lease the equipment from petitioner for fair market value, which would be established by a good faith third party bid made within the last 30 days or, if there were no bids, at an independently determined appraised value. The exclusive marketing agency agreement provided petitioner with the right to (1) take any lawful action *82 with respect to the sale or lease of the equipment, (2) specify the manner of sale, and (3) examine GCC's books and records pertaining to the equipment. The 1975 Computer Market
IBM 360 computer equipment was first introduced into the market place in the mid 1960s. The IBM 360 was the first line of computer equipment which offered a wide range of compatibility with other IBM computer equipment. The IBM 370 line of computers, first introduced about 1971, was considered only a half-generation advancement from the IBM 360 line. As a result of an economic recession in the United States, large corporations were cutting back on planned outlays for computer equipment in 1975 and began actively purchasing or leasing IBM 360 CPUs and peripherals rather than the newer lines of IBM 370 equipment. IBM 360 equipment could perform much the same work as IBM 370 equipment, the programs were interchangeable, and IBM 360 peripherals could be used with IBM 370 CPUs. In March 1975, IBM abandoned plans for its "Future System" (its next generation of computers). In May and June of 1975, the prices for used IBM 360 equipment increased. Certain publications also speculated around this time *83 that the useful life of IBM 360 equipment could be expected to lengthen as a result of IBM's announcement and an increased demand for used equipment due to the recession. The History of the Transaction
On June 13, 1975, the computer equipment purchased by petitioner and leased to EDP, Bresnahan, and Traleascorp, for monthly rent totalling $51,900, was being subleased to various end users comprised of substantial corporations, banks, universities, and GCC data centers for monthly rents totalling over $74,676. During the next 74 months, petitioner received quarterly reports on its computer equipment. For the period through the quarter ended December 31, 1978, such quarterly reports separately identified the lessee, each piece of computer equipment, the name of the sublessee, the location of the equipment, and the monthly rental paid by the sublessee. For the period up to the quarter ended June 30, 1981, a condensed quarterly report was sent to petitioner identifying the lessee and the total monthly rental paid by all sublessees to that lessee. During the term of petitioner's leases, EDP, Bresnahan, and Traleascorp were liquidated and all their assets and liabilities, including *84 these leases, were transferred to and assumed by GCC. By letter dated June 26, 1981, GCC informed petitioner that its final note payments were due on August 15, 1981. Along with this letter, petitioner received a current listing of its computer equipment, indicating that the equipment was generating monthly rental income from subleases in June 1981 of $16,205 and that such equipment, based upon existing subleases, would produce firm rental income after August 15, 1981, of $165,526.58 without regard to extensions of such subleases, any future subleases, or sales. Petitioner's options at the expiration of the leases were to (1) forfeit the equipment and allow foreclosure on the nonrecourse balloon notes, (2) retain the equipment and pay GCC $173,270, or (3) retain the equipment and exercise its option under the secured promissory notes to execute a new note secured by petitioner's equipment, providing the conditions of the original notes were met. Renouard advised petitioner's then legal counsel, James Silhasek, that based upon his meetings with GCC, the firm future rentals of $165,526.58, and his review of the equipment and subleases, petitioner would be best to satisfy its obligation *85 on the balloon notes and not forfeit the equipment. On August 15, 1981, petitioner, through receipt of rental payments, had recovered all but $111,196 of its initial cash payments of $319,900 ($268,000 principal and $51,900 loan fees), had paid off all 3 promissory notes except for the balloon obligations due GCC in the amount of $173,720, and its equipment was on lease with firm lease payments due petitioner of $165,526.58. Petitioner elected to pay off the outstanding balance of $173,720 by executing a new secured promissory note dated August 15, 1981, at 12 percent interest with a term of two years. The terms of the August 15, 1981 note authorized GCC to apply all proceeds derived from the marketing of petitioner's equipment pursuant to the June 13, 1975 exclusive marketing agency agreement to the outstanding principal and interest obligation. Following the execution of these notes, GCC sent petitioner quarterly reports reflecting for each month (1) rental proceeds; (2) sales proceeds; (3) description of the equipment sold including sales price; (4) monthly interest on the replacement note; (5) direct expenses chargeable to petitioner; and (6) marketing commissions paid to *86 GCC. Based upon the continued leasing and sales of the computer equipment, petitioner was able to pay off the replacement note and all interest thereon in full by November 1982. Thereafter, the computer equipment continued to be marketed by GCC, which then charged marketing commissions based upon the schedule set forth in the exclusive marketing agency agreement. For the period November 1982 through March 31, 1984, petitioner received rental and sales proceeds totalling $56,582.81 after deductions for direct expenses and GCC commissions. During this time, petitioner paid direct expenses on the equipment -- property taxes, insurance, maintenance, relocation costs, and amounts other than to GCC to facilitate sales -- totalling $45,576.29. As of March 31, 1984, petitioner paid off all promissory notes and interest accruing thereon and had recovered all but $54,613.14 of its cash down payments totalling $319,900. Further, petitioner's computer equipment was on firm lease contracts with sublesses which assured future revenues of at least $24,000 without regard to extensions of such subleases, future subleases, sales, or scrap value. On or around November 23, 1983, petitioner extended *87 the exclusive marketing agency agreement with GCC. Substitution of Equipment
In marketing petitioner's computer equipment, GCC and its subsidiaries sometimes provided a purchase option to the sublessee. This was a common practice in the computer leasing industry by the mid-1970's and such options were in a good percentage of the leases written.GCC and it subsidiaries offered its customers two types of purchase price options -- one at fair market value and one at a fixed price. While such purchase options were the exception rather than the rule in 1975 with respect to subleases of petitioner's computer equipment, GCC and its subsidiaries were forced to include more and more purchase options in subleases in the later years to remain competitive. The lease agreements with petitioner provided for substitutions of computer equipment when such equipment was sold to a sublessee by reason of election of a purchase option. GCC and its subsidiaries were obligated to make all substitutions with equipment which was similar and of substantially equal value. The substitutions could not always be made with identical equipment but, due to the substitution policy of GCC and its subsidiaries, *88 the substitution of equipment which was not identical to that which was replaced lead to an overall increase in the value of petitioner's computer equipment portfolio. Before substitutions were made, a list of the equipment to be disposed of and a list of the substitute equipment was provided to petitioner in the form of an amendment to the lease agreement. These amendments were to be executed by petitioner and returned to GCC. During the period June 13, 1975, through 1978, substitutions were infrequent and had essentially no effect on the portfolio value. Substitutions increased, however, in later years because (1) GCC was granting more purchase options; (2) the non-IBM peripherals purchased from Traleascorp began to develop maintenance problems which caused customers to return the equipment, and (3) the market for IBM 360 equipment, especially CPUs, decreased. Based upon its contractual agreements with petitioner, GCC and its subsidiaries were required to keep the equipment under maintenance and to effectively market it. When GCC found that it could not meet these obligations, it substituted equipment that could be maintained and marketed. With respect to the non-IBM peripherals, *89 GCC periodically replaced such equipment with IBM peripherals because it found that it could not keep the non-IBM equipment operating. Because of the demise of the market for IBM 360 equipment, especially CPUs, GCC found that it was no longer able to lease some of petitioner's equipment. GCC was concerned that its failure to lease such equipment might give petitioner an actionable lawsuit against GCC based on the terms of the exclusive marketing agency agreement. As a result, GCC began to substitute some of this equipment with equipment which it could lease. Many of petitioner's IBM 360 CPUs were replaced with IBM 360 and 370 peripherals and many IBM 360 peripherals were replaced with IBM 370 peripherals. Peripheral equipment, however, was never replaced with a CPU. Reporting of the Transaction
Prior to closing the transaction, all underlying documents were reviewed by legal counsel for GCC who concluded that the transaction was a sale and leaseback under local law. A Form 8K is required to be filed by a publicly traded corporation whenever a significant business event occurs, such as the sale of a substantial amount of corporate assets. On July 1975, GCC filed a "Form *90 8K, Current Report," with the Securities and Exchange Commission ("SEC") for June 1975 reflecting that computer equipment had been sold by EDP, Bresnahan, and Traleascorp to petitioner. Separate Forms 8K were also filed by EDP and Bresnahan reflecting the sale of computer equipment. On November 12, 1975, GCC filed a "Form 8 Amendment to Application or Report" with the SEC attaching copies of the underlying legal documents for the sales and leasebacks of the computer equipment to petitioner. GCC's 1975 Annual Report stated that the sale and lease-back transactions were not treated as sales for financial accounting purposes. Rather than eliminating the equipment which was the subject of the sale and leasebacks from their equipment accounts, GCC credited the net cash proceeds received at dates of sale and leaseback over the present value of related net lease obligations to the carrying value of the equipment. In a GCC internal memorandum dated June 27, 1975, the equipment which was the subject of the sale and leaseback was identified, and with respect to this equipment it was stated that ownership codes were to be changed and the covenants in the lease agreement were to be observed. *91 The memorandum went on to state: Basically, we [GCC and subsidiaries] are responsible for insuring the equipment, must keep it in the U.S., should not sell it, and when off-rent should assign it to new lease without any discrimination between GCC owned units and the leased units. In the event of damage/destruction, exercise of a purchase option by a customer, or necessity to ship outside the U.S. and/or sell off-rent leased units, we have certain rights to unilaterally substitute or request permission to substitute equipment having comparable fair market value. Petitioner treated the transaction on its own income tax returns as a sale and leaseback of computer equipment, reporting as income the rental proceeds received, deducting the interest payments made, and claiming depreciation deductions on the equipment. Petitioner also reflected its ownership of the subject computer equipment on business property tax returns filed with the state of Arizona. OPINION Respondent has challenged the above-described transaction on several grounds. First, respondent claims that the transaction was a tax avoidance scheme without business purpose or economic substance and which must be *92 disregarded for Federal income tax purposes. Second, respondent claims that, during the years in dispute, petitioner lacked the attributes of ownership necessary to be treated as the owner of the computer equipment for income tax purposes. Economic Substance
In the sale and lease back context, we have set forth a standard by which a transaction will be disregarded for Federal income tax purposes if the Court finds "that the taxpayer was motivated by no business purpose other than obtaining tax benefits in entering the transaction, and that the transaction has no economic substance because no reasonable possiblity of a profit exists." Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 91 (4th Cir. 1985), affg. in part, revg. in part 81 T.C. 184, 209 (1983). This standard makes a finding of "tax sham" inappropriate if either a business purpose or a reasonable possibility of economic profit apart from tax benefits is shown to have been present in the transaction. Mukerji v. Commissioner, 87 T.C.     (Oct. 29, 1986); Packard v. Commissioner,85 T.C. 397, 417 (1985); see also Gefen v. Commissioner, 87 T.C.     (Dec. 30, 1986). *93 Based on a thorough review of the record in this case, we believe that petitioner has demonstrated that the transaction here under consideration had a reasonable possibility of profit and, hence, had sufficient economic substance to be recognized for Federal income tax purposes. [4]
The agreements which make up this transaction guarantee the amount of lease payments which petitioner will receive for the first 74 months following the purchase of the equipment. As GCC, the guarantor of the lease payments, is the subsidiary of a major publicly traded corporation, the risk associated with receipt of the lease payments is minimal. Petitioner's initial cash investment upon entering the transaction was $319.900, the sum of the down payments and loan fees or points. During the 74-month term of the leases, petitioner was guaranteed the receipt of net cash payments totalling $208,704. Further, as of the end of the lease terms, all but $173,720 of the principal and interest *94 due on the purchase notes would have been paid. On these facts, therefore, whether a reasonable prospect of economic profit existed at the time petitioner entered into the transaction depends upon whether the residual value of the equipment of the end of the 74-month lease term, less any marketing costs and the marketing fee due GCC at such time, could reasonably have been expected to exceed $284,916. [5]
Three expert witnesses offered reports and testimony on the residual value of the portfolio of computer equipment originally acquired by petitioner. Each expert report purported to establish the residual value which the equipment would be expected to have on August 15, 1981, as viewed from the perspective of an investor in 1975. Respondent's expert witness, Dee Morgan, calculated the residual value of the equipment by (1) estimating the fair market value of the equipment in 1975 by assigning to each piece of equipment a fair market value equal to the lower of the price shown for *95 the piece of equipment in the Computer Price Guide [6] for the summer of 1975 or the price assigned by GCC in the purchase agreement and (2) applying straight-line depreciation to these values based on the estimated remaining useful lives of the equipment. Morgan estimated the remaining useful lives of the equipment by examining historical precedent prior to 1975. One of petitioner's expert witnesses, Frederick G. Withington, calculated the residual value of the equipment based upon a report he had prepared in 1975. Withington's 1975 report was done for a computer leasing company that wanted a basis upon which to make financial decisions relating to its portfolio of computer equipment. The equipment covered by the report included most of the same types and models of IBM equipment present in petitioner's original portfolio. *96 The report projected the residual value of the equipment through 1980. This report established the trends of residual value for the individual types of equipment as a percentage of their original list price. Withington extended the trends into 1981 in preparing his report on petitioner's portfolio and applied the percentages so developed to the 1970 IBM list prices for petitioner's equipment. For non-IBM equipment, Withington used the residual value percentages developed for equivalent IBM equipment and the list prices of such equivalent IBM equipment decreased by 20 percent to take into account the market premium paid for the IBM label. Petitioner's other expert witness, Robert Djurdjevic, calculated the residual value of the equipment by first determining the equipment's fair market value in 1975 through the use of the IBM list prices for the equipment in 1975 and applying to such prices the Computer Price Guide's listing of the percentages of list price which used equipment would be selling for in 1975. Djurdjevic then mathematically evaluated the market trends for the period 1970 through 1975, for each type of equipment, and projected these trends forward with adjustments *97 for the perception in 1975 of how much certain items of the equipment would depreciate in the following years. Djurdjevic developed a total residual value for the equipment which he then decreased by 15 percent to account for what he believed would be a necessary cost of marketing the equipment in 1981. Using the above methods, each of the experts estimated the total residual value for petitioner's equipment portfolio which could reasonably have been expected in 1975. The estimated residual values, the commission GCC would receive on a sale at these prices, and the net amount which would be received by petitioner on such a sale are as follows: Petitioner's
Expert Witness
Residual Value
GCC's Commission
Net Amount
Morgan
[7] $309,200
$31,360
$277,840
Withington
695,500
244,940
450,560
Djurdjevic
646,000
215,240
430,760
Petitioner objects to Morgan's valuation of the residual interest in the equipment on several grounds. First, petitioner *98 contends that rather than using a consistent approach in determining the 1975 value of each piece of equipment, Morgan improperly used the lower of the Computer Price Guide's 1975 value estimates or the sales prices assigned by GCC. These values were depreciated by Morgan in determining the residual value of the equipment. Second, petitioner contends that Morgan failed to assign a residual value to the equipment which she found to have exceeded its useful life in 1981, and as a result she improperly assigned a zero value to such equipment. Third, petitioner contends that Morgan treated the remaining useful life of the equipment in 1975, other than input/output equipment, as no more than 5 years, even though the special 5-year edition of the Computer Price Guide Published in 1975 indicated that the useful life should be longer. After a careful review of the record, we agree with petitioner's contentions regarding Morgan's residual value determination. Morgan determined that the remaining useful life in 1975 of all of the equipment other than the input/output equipment would not have been expected to exceed 5 years, and therefore, assigned a zero residual value to such equipment. *99 Morgan did not assign a residual value to this equipment based on scrap value because she felt that the valuation was intended to be on an "in use" basis. Withington gave uncontradicted testimony that the scrap value of the CPUs, after a reduction process, would be at least $30,000 to $40,000. Further, the special 5-year edition of the Computer Price guide published in 1975 stated: The IBM 360 computer is now approximately ten years old and some observers believe that many 360's are going to be around for the next ten years. One should expect that useful life will be extended if future systems remain compatible with the older computers. In other words, if IBM brings out a "380" and it is compatible with the 370, which is now compatible with the 360, the 360 may be around until the end of the 1980's. We also do not believe that Morgan provided an adequate explanation for her use, in her valuation of the individual pieces of equipment, of the lower of the Computer Price Guide's value estimates or the prices assigned by GCC. This hybridization of 2 methods of valuing the equipment seems calculated to create as low a valuation as possible. If Morgan's figure for the residual *100 value of the equipment is adjusted for the apparent scrap value of the CPUs alone, her estimate of the residual value would be at least $340,000. This residual value would provide petitioner with a net amount on the sale of the equipment of approximately $300,000, an amount sufficient to give petitioner a small profit on the overall transaction. The record demonstrates that a larger adjustment to Morgan's valuation is appropriate. Respondent's main objection to Withington's determination of residual value relates to Withington's valuation of the non-input/output equipment.Respondent contends that the values placed upon such equipment by Withington represent such a small percentage of the original list price of the elquipment that such values are too speculative to be used. Respondent apparently contends that anytime the estimated residual value of a piece of equipment drops below 10 percent of its list price, the residual value must be treated as zero because of the speculative nature of such an estimate. We fail to see a rational basis for this contention. Further, we find Withington's report to have special indicia of reliability. Withington's estimate of residual value was *101 based upon a report which he had prepared in 1975. This report was prepared for a computer leasing company that needed a basis upon which to make financial decisions relating to its own portfolio of computer equipment. The credibility of Withington's estimate is, therefore, bolstered by the fact that it is based upon a report which was prepared contemporaneously with petitioner's entry into the transaction in question and which was prepared for financial purposes and relied upon as a basis for making financial decisions. The assumptions made in preparing the report are inherently more reliable than assumptions made nearly 10 years later in reports prepared for litigation purposes. Withington's estimate of the residual value of the computer equipment would clearly provide petitioner with a substantial profit from the transaction. Further, Djurdjevic's estimate and Morgan's estimate, adjusted for the above-mentioned reasons, also support a finding that the computer equipment would have been projected in 1975 to have a residual value sufficient to provide petitioner with a reasonable prospect of a substantial economic profit. Accordingly, we hold that the transaction in question *102 was not without economic substance, and hence, may not be disregarded for Federal tax purposes. [8]
Benefits and Burdens of Ownership
The second issue for decision is whether petitioner held sufficient benefits and *103 burdens of ownership to be regarded as the owner of the computer equipment for Federal income tax purposes. Our holding that the transaction in question is not a "tax sham in substance" does not foreclose further discussion of whether the form of the transaction must be accepted for Federal tax purposes. Packard v. Commissioner,supra at 419, citing Commissioner v. Court Holding Co.,324 U.S. 331, 334 (1945). Respondent contends that petitioner does not possess sufficient attributes of ownership to be considered the owner of the computer equipment and that petitioner's interest is more in the nature of a lender or option holder. Petitioner's position, of course, is to the contrary. In Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221 (1981), we stated, "The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563, 570-571 (1965). The key to deciding whether petitioners' transactions * * * are sales is to determine whether the benefits and burdens of ownership *104 have passed * * * to petitioners. This is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances. Haggard v. Commissioner,24 T.C. 1124, 1129 (1955), affd. 241 F.2d 288 (9th Cir. 1956). * * * [77 T.C. at 1237.] In Estate of Thomas v. Commissioner,84 T.C. 412 (1985), we found the following factors to be essentially neutral in making the determination of whether a taxpayer is the owner of property: (1) the existence of a net lease, 84 T.C. at 433; (2) the absence of significant positive net cash flow during the leaseback term or rent geared to interest and mortgage amortization, 84 T.C. at 434; and (3) the use of nonrecourse liability. 84 T.C. at 436. Factors which we found to be relevant to the determination of ownership included: (1) the taxpayer's equity interest in the property as a percent of the purchase price, 84 T.C. at 436; (2) the existence of useful life of the property in excess of the leaseback term, 84 T.C. at 436; (3) renewal *105 rental at the end of the leaseback term set at fair market rent, 84 T.C. at 436; and (4) the expectation of a "turn around" point which would result in the investors' realizing income in excess of deductions in the later years and net tax benefits during the leaseback term less than the unrecovered cash investment. 84 T.C. at 438. In Estate of Thomas, we looked to the facts of Frank Lyon Co. v. United States,435 U.S. 561 (1978), as establishing a level of ownership attributes sufficient to satisfy the requirements of ownership for Federal tax purposes. In Frank Lyon Co. the taxpayer's cash investment in the property purchased (and subject to a leaseback) was approximately 6 percent. In the case now before us, petitioner's initial cash investment in the property was approximately 9 percent.[9] Similarly, in Frank Lyon Co., the potential lease term was probably close to the useful life of the property involved, while in this case, the evidence entered with respect to the equipment's residual value demonstrates that the useful life of most of the equipment significantly exceeded the lease terms. *106 During the two years in which the exclusive marketing agency agreements would be in effect, following the end of the lease term, GCC was permitted to purchase or lease the equipment, but only for fair market value or rental. As we stated in Estate of Thomas, the existence of an option to purchase or re-lease the property at fair market value or rental is not inconsistent with the taxpayer's status as owner of the property. 84 T.C. at 434. During the fifth year of the lease term, the transaction was expected to reach a "turn around" point such that the income produced by the rental of the equipment would begin to exceed the deductions for depreciation and interest. At the end of the lease term the net tax savings were expected to be considerably less than petitioner's unrecovered cash investment. This is further evidence that the form of the transaction should be respected for tax purposes. Estate of Thomas v. Commissioner, supra at 438. The substitution of equipment by GCC is not contrary to petitioner's ownership under the circumstances present in this case. The agreements executed by the parties allowed for substitution of equivalent equipment *107 when market factors made such substitutions prudent. The substitutions were accompanied by notification to petitioner and the amending of documentation necessary to treat petitioner as the owner of the substituted equipment. Petitioner had a real potential for loss of at least part of his cash investment in the property and, as we discussed in reference to residual value, a real opportunity for economic profit. Accordingly, we find that petitioner held sufficient benefits and burdens of ownership to be regarded as the owner of the computer equipment for Federal income tax purposes. Decisions will be entered under Rule 155.
Footnotes
1. These concessions include concessions by petitioner that, due to a failure to file a proper election, the property in question must be depreciated over 7 years rather than 5 years and that petitioner is not entitled to utilize the averaging convention provided in sec. 1.167(a)-11(c)(2), Income Tax Regs. See sec. 1.167(a)-11(f), Income Tax Regs.↩
*. 150% declining balance with shift to straight line method in 3rd year. 5% Salvage ($36,500) not included in total shown ($693,500 + $36,500 salvage = $730,000). Assumes full year ownership and uses the modified 6 month depreciation convention. Depreciation Period: 5 years. ** Assumes $12,975 in points to fund transaction in first month.↩
2. The promissory note executed pursuant to the agreement with Traleascorp was actually executed in favor of D.S., Inc., its sister corporation.↩
3. These rental payments were approximately equal to 1.774 percent of the purchase prices of the equipment.↩
4. This finding makes it unnecessary to consider the more subjective question of petitioner's motivations for entering into the transaction. Packard v. Commissioner,85 T.C. 397, 417↩ (1985).
5. This amount is calculated as follows: ↩
Initial cash investment
$319,900 Less: Net cash receipts
(208,704)
$111,196 Plus: Outstanding debt
173,720 $284,916 6. The Computer Price Guide is a quarterly journal published by Computer Merchants, Inc. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment and is widely relied upon in the industry. See Mukerji v. Commissioner,↩ 87 T.C.     (Oct. 29, 1986).
7. Morgan testified that this amount should be decreased by 15 percent as an average marketing cost. Whether all or part of such marketing costs are represented by GCC's commission is unclear.↩
8. Respondent also argues that a lack of economic substance is demonstrated by the inflation of the purchase price. Each of the expert witnesses made estimates of the fair market value of the equipment as of the date of purchase. Morgan's estimate was based on her approach of using the lesser of the Computer Price Guide's figures and the prices set by GCC. For this reason, we consider Morgan's estimate to be unpersuasive. The other two experts estimated fair market values which were less than the total purchase price, based on the Computer Price Guide's figures. The evidence shows, however, that a "lease premium" is appropriate where such equipment is on lease and being marketed by a respected computer leasing corporation. See Mukerji v. Commissioner,supra.↩ Based on the record, we believe that the fair market value of the equipment as of the time the transaction was entered was approximately equal to the purchase price agreed to by the parties.
9. The record indicates that petitioner's cash investment approximately equals his initial equity in the property. See supra↩ n.8.